## STATE OF FLORIDA v. GIBSON

## STATE OF FLORIDA v. GIBSON and DORITY

Case Nos. 84-4824 CF and 84-4825 CF

Fifteenth Judicial Circuit, Palm Beach County

July 15, 1985

### APPEARANCES OF COUNSEL

**Frank Scott,** Assistant State Attorney, for plaintiff.

**Douglas N. Duncan** for defendant, Christopher Dority.

**Nelson Bailey** and **Stephen Koons** for defendant, Timothy Scott Gibson.

### OPINION OF THE COURT

CARL H. HARPER, Circuit Judge.

On August 1, 1984, the State Attorney filed an information in case number 84-4824 CF charging the defendant, Timothy Gibson, with second degree murder of Rex Inman. Inman was a 21 year old black

1

male whose body was discovered on March 31, 1984 in an abandoned house located at 6496 Belvedere Road, Palm Beach County.

On August 23, 1984, the grand jury filed its indictment in case number 84-4825 CF charging Timothy Gibson, Christopher Dority and Clyde Woods with first degree murder in count one; burglary of a dwelling in count two; sexual battery upon a victim helpless to resist in count three; and kidnapping in count four. The crimes are alleged to have been committed between January 29, 1984 and February 3, 1984. The victim of all four crimes was Meriam Bruno, a seventy-one year old white woman who lived at 1404 Skees Road in Palm Beach County.

On October 10, 1984, the defendant, Clyde Woods, filed his Motion to Suppress Confession and Admissions. The motion came on for lengthy evidentiary hearings on November 8, 1984 and November 20, 1984. Woods, who was 14 years of age at the time, had been taken to the Palm Beach County Sheriff's Office on July 24, 1984 where he was questioned by three officers from about 11 a.m. until about 7 p.m. On Decmeber 28, 1984, this court entered its 23 page written order granting the motion to suppress filed by Woods. The State Attorney filed an appeal to the District Court of Appeal, Fourth District, on January 7, 1985. However, on May 31, 1985, the Attorney General's office in West Palm Beach filed a Notice of Voluntary Dismissal of the appeal, apparently because the appeal had no merit. The appeal was dismissed by the appellate court on June 5, 1985. In turn, the State Attorney dropped the charges as to Woods in a written nolle prosse filed on June 13, 1985.

On January 21, 1985, a Motion to Suppress Confession and Admissions was filed on behalf of Christopher Dority in case number 84-4825 CF by his attorney, Douglas N. Duncan. On January 29, 1985, a Motion to Dismiss the sexual battery charge in count three was filed pursuant to Rule 3.190(c)(4) on behalf of Dority by his attorney. Both motions came on for a full day evidentiary hearing on April 1, 1985. At the outset of the hearing, the parties stipulated into evidence a Miranda rights card as exhibit 1; four cassette tapes as exhibits 2-5; a videotape as exhibit 6, as they relate to the motion to suppress; and pages 31-37, 56-58, 59-60 of a deposition given by Dr. John Marraccini, Associate County Medical Examiner of Palm Beach County, as it relates to the motion to dismiss count three. Furthermore, Duncan candidly acknowledged that paragraph 2(g) of the motion to suppress should be denied on the authority of State v. S.L.W., 10 FLW 171 (Fla. 1985). At the conclusion of the hearing, this court orally granted the motion to dismiss count three for the same reasons that the same

2

count had been dismissed as to Timothy Gibson, as will be discussed hereinafter. No appeal has been taken by the State Attorney from the oral dismissal. As to the motion to suppress, the court deferred ruling for entry of this written order and requested counsel to submit proposed orders within 10 days. Mr. Duncan belatedly submitted his proposed order on May 23, 1985. The prosecutor, Frank Scott, belatedly submitted his proposed order on May 23, 1985.

On October 30, 1984, a Motion to Dismiss Count Three pursuant to Rule 3.190(c)(4) was filed in case number 84-4825 CF on behalf of Timothy Gibson by his attorney, Nelson Bailey. The state filed its Reply and Traverse on January 8, 1985. That motion was heard on January 10, 1985. On January 14, 1985, this court filed its written order granting the motion for the reasons stated therein. The State Attorney filed an appeal to the District Court of Appeal, Fourth District, on January 22, 1985. However, the Attorney General's office in West Palm Beach filed a Notice of Voluntary Dismissal of the appeal on March 25, 1985, apparently because the appeal had no merit. The appellate court dismissed that appeal on March 27, 1985.

On January 24, 1985, a Motion to Suppress Confession or Admissions was filed on behalf of Timothy Gibson in case number 84-4825 CF by his attorney, Nelson Bailey. That motion came on for an evidentiary hearing held on January 29 and 30, 1985, but the parties were not able to conclude the hearing within the time they reserved. Therefore, on March 5, 1985, a Motion to Suppress Confession, Admissions and Tangible Physical Evidence was filed on behalf of Timothy Gibson in case number 84-4824 CF by his attorney, Stephen Koons. The evidentiary hearing on all the motions then pending in both cases resumed on April 4, 1985, lasting all day, and on April 5, 1985 for 3 hours in the afternoon, but without conclusion. The hearing resumed again on June 3, 1985 at 9:30 a.m. and the presentation of the evidence finally concluded about noon. The attorneys were instructed to present proposed orders within three weeks. Mr. Bailey submitted his proposed order on June 24, 1985. Mr. Koons submitted his proposed order on June 28, 1985. Mr. Scott submitted his proposed order on July 1, 1985.

All of the above mentioned evidentiary hearings were duly reported. A transcript of the evidentiary hearings held on the motions filed by Gibson in both cases has already been transcribed, consisting of 826 typewritten pages contained in 6 volumes (hereinafter referred to as hearing transcript). This court has used the hearing transcript, as supplemented by the court's handwritten notes made during the hearing, to prepare this order. All page numbers listed herein refer to

3

the hearing transcripts. However, it should be pointed out that the videotapes were not presented to the court in the same chronological sequence that the videotapes were made, resulting in some confusion. There is no transcript of the evidentiary hearing on the motions filed by Dority. Likewise, there is no transcript of the cassette and videotapes made during Dority's interrogation. Therefore, this court used its handwritten notes taken during the hearing to prepare this order.

All together, this court has seen and heard approximately 20 hours of videotapes and cassette tapes made by all three defendants. All the videotapes were surreptitiously made by the use of a television camera concealed behind plexiglass in the ceiling of a small interview room at the Sheriff's Administration Building. None of the defendants were aware of the videotaping and had not consented thereto, except as noted hereinafter. All the videotapes and cassette tapes are in evidence and constitute the best evidence of what was said by the defendants and the circumstances under which it was said.

Because of the gravity of the charges in the two cases before this court, this comprehensive, time consuming order is warranted. The Inman and Bruno families, the state, the defense and the public in general deserve to precisely know this court's rationale and reasons for suppressing the confessions. Furthermore, the investigating officers certainly deserve to know so they may avoid the same errors in the future. In doing so, this court will highlight in detail the egregious interrogations that took place in clear violations of the Fifth and Sixth Amendments of our constitution, denying Gibson and Dority due process of law. Anyone who will take the time to view the lengthy videotapes in evidence will readily understand why our founding fathers provided such protections in the constitution. It ought to be mandatory that these videotapes be viewed by all law enforcement officers, as a part of their training, as a model of "How not to take a confession."

Based on the totality of the circumstances surrounding the statements and confessions made by Gibson and Dority and on the other evidence presented, this court is compelled to grant the motions now under consideration for the reasons set forth hereinafter. In doing so, this court will summarize the events as they chronologically occurred.

### The Inman Homicide

The defendant, Timothy Gibson, became a suspect in this homicide because of his purported resemblance to a composite drawing and because of his alleged reaction to a news report of the homicide. The composite drawing had been prepared based on a description given by

4

Harold Miller, a retired police officer. However, when Miller was shown a photographic lineup which included a photograph of Gibson, Miller was not able to identify Gibson as the person he had driven to the homicide scene with Inman. On July 22, 1984 at about 10:30 a.m., Dority told investigator Wesley N. Buxton that he and Gibson were at their home one day when Channel 12 had a brief telecast announcing the Inman homicide. Allegedly, Dority told Buxton that Gibson turned off the telecast, telling Dority that "a black faggot had been killed out off Belvedere" and that he (Gibson) had "given him a shot between the eyes." See pages 440-443. There was no other evidence linking Gibson to the Inman homicide.

On Sunday, July 22, 1984, Gibson was in custody at the Palm Beach County Stockade charged with burglarizing Murphy's Towing. On that date, Gibson was brought from the stockade to the Sheriff's Administration Building where he was interrogated at great length by four officers individually and in teams of two or more, namely Wesley N. Buxton (the lead investigator), Richard Oetinger, J. J. Anderson and William Martin, all investigators of the Palm Beach County Sheriff's Department. The interrogation began at 1:57 p.m. and ended at 8:47 p.m. Buxton read the standard Miranda rights card to Gibson, but did not tell him the purpose of the interview and did not tell Gibson that he was a suspect in the Inman homicide. After reading the Miranda card to Gibson, Buxton asked the compound question, "You understand all of those, do you have any questions about those," to which Gibson replied, "No." Gibson signed the card as directed by Buxton. See pages 84-85.

Buxton then began a series of questions regarding Gibson's background and habits. See pages 85-98 and 105-129. During that questioning, Oetinger entered the room and joined in the interview. Oetinger obtained a written consent to search Gibson's home. See pages 120-127. When Gibson asked Oetinger why he wanted to look at his clothing, Oetinger replied, "We are working on some burglaries." See pages 124-126. After obtaining the consent to search, Oetinger left the interview room. Shortly thereafter, Buxton began to vaguely reveal to Gibson the true purpose of the interrogation, namely the Inman homicide. See page 129, et seq. Buxton, Oetinger and Anderson took turns in the accusatorial interrogation that followed. Buxton outlined the evidence against Gibson, falsely telling Gibson that Harold Miller could positively identify him and that physical evidence found at the scene would connect Gibson to the crime. See pages 161-162. Gibson repeatedly and steadfastly denied any knowledge of Inman and any involvement in the homicide. On at least two separate occasions during the interrogation,

**5**

Gibson stated, "I ain't saying nothing" and "I ain't saying a damn thing." See pages 145-146 and 166. Nevertheless, the interrogation continued. Buxton and Oetinger suggested to Gibson that he had killed Inman accidentally or in self-defense when Inman made homosexual advances on him. Buxton suggested to Gibson that his superiors would charge Gibson with first degree murder unless he claimed self-defense. See pages 163-173. Nevertheless, Gibson remained adamant in his denial. Buxton told Gibson, "Don't let us go off with any misconceptions because by golly I don't want to file a heavy first degree murder charge against you if that is not really what it is, you know." See page 176. Oetinger told Gibson, "Let us work it out with you, but you have got to start by helping yourself . . . we know you didn't mean to do it and it was an accident, but you are going to have to tell us that." See pages 180-181. Buxton falsely told Gibson that "Dority is taking a polygraph examination," to which Gibson replied, "I will take a polygraph examination. I did not kill that guy." See page 184.

Shortly thereafter, J.J. Anderson entered the interview room to replace Buxton who then left the room. See page 186. Anderson then began to interrogate the defendant, suggesting he killed Inman in self-defense. Anderson also suggested to Gibson that he was a suspect in the Bruno homicide. He told Gibson that he did not want to tell his investigator to "run with what you got" because he did not believe that the killings of Inman and Bruno were intentional. See pages 194-195. Thereupon, Anderson asked Gibson if he wanted "that polygraph," to which Gibson replied, "I don't think so because I am scared shitless I might be going to jail for something I didn't do." Anderson then stated, "Why don't you take the polygraph to prove that you didn't? That would make me feel better." Gibson agreed to take the test. See pages 195-196. Anderson left the room to call William Martin, the polygraphist, to come in for the test. Buxton continued to interview Gibson until Anderson returned. Anderson read a police report to Gibson and tried to persuade Gibson to admit his involvement in the Inman homicide, but without success. The interrogation then switched to Gibson's past employment by Bruno. See page 214. Anderson told Gibson, "You have got problems. You have got two big hairy problems, a dead old lady that I think nobody meant to kill and a dead black guy who probably got himself killed." Gibson denied his involvement in both cases. See pages 216-217. Gibson told Anderson, "I don't even want to talk to you about this stuff because I don't want to have nothing to do about it." Anderson replied, "If you say you don't want to talk to us, we can't if you—you know that if you want us to present, we will present everything we have without going further, without

giving you a chance. That is up to you. I think you ought to help yourself. You want to talk with us about this mess." See pages 218-219. This concluded the playing of state's exhibit 1, the videotape, and the evidentiary hearing of April 4, 1985.

The hearing resumed at 1 p.m., on April 5, 1985 at which time state's exhibit 2, a videotape was shown in open court. Anderson questioned Gibson about many innocuous things, such as auto burglaries, dirty books and movies, gas stealing, lectured Gibson about his lack of education, and a shooting in Westgate. Buxton then entered the interview room and began to lecture the defendant about God, the hereafter, and polygraphs. See pages 256-258. Gibson stated, "I'd rather not talk about any of this stuff as I don't have nothing to do with this stuff." See page 258. Nevertheless, Oetinger and Buxton continued the accusatorial interrogation, all of which Gibson persistently denied. Eventually, Oetinger told Gibson it would be a lot easier on him if he told his side of the story, and that if he did not cooperate by giving information, then it would be treated as an intentional murder rather than as an accident. See pages 266-268. Oetinger asked Gibson to "tell the story," to which Gibson replied, "I don't know the story." See page 270. At this point, Anderson, Buxton, Oetinger and Gibson left the interview room and went out into the hall where a partially inaudible conversation took place. See pages 271-273. During that conversation, Oetinger was heard to tell Gibson, "We are here to help you out as if you are going to help yourself out . . . why don't you come back in here and tell your side of the story?" See pages 272-273. While out in the hall, Anderson apparently took a couple of snapshots of Gibson. Gibson and Anderson then returned to the interview room where Anderson compared the photographs with the composite. Anderson told Gibson, "Maybe the test will tell. Boy, I hate to see you get stuck for something, for somebody like him, something like him that he was likely to get killed anyway. I hate to see you get stuck for something like that." See page 275. Anderson kept trying to persuade Gibson to accept the chance he was being given and that "by holding it back you are just making things worse for yourself." See pages 279-282. Gibson continued to deny his involvement. Anderson continued his efforts to get Gibson to confess and told him, "I want you to take the test." See pages 283-287.

At 5 p.m., William Martin, polygraphist of the Palm Beach County Sheriff's Department, entered the interview room and met Gibson. Anderson left the room. Martin did not read a Miranda rights card to Gibson, but merely paraphrased those rights, totally emasculating the Miranda warnings as follows:

7

"You have the right to the presence and representation of a lawyer of your choice before you make any statements and during any question. Let me say this: *I can't do anything to help you in any way if you say you want an attorney. That is, you know, that is out and all that is going to do is create a problem for you because I have never had anybody who is telling the truth to refuse a polygraph.* You know if you are telling the truth, the polygraph is going to help you and if you are not, then it is going to hurt you.

"Okay, and then if you can't afford a lawyer, you are entitled to have one appointed to you by the courts. Again, *I have never seen one appointed where somebody wasn't charged with something. This is done through the court by the judge when somebody comes up before him for trial.*

"If at any time during the interview you do not wish to answer any questions you are privileged to remain silent. *That means if I ask you a question and you don't want to answer it, you don't have to. It doesn't mean the interview is ended. It just means that in that case you don't want to answer it.*

"I can make no threats or promises to induce you to make a statement or answer questions. You must do so of your own free will. Do you understand those?"

See pages 291-292. It should also be noted that Martin did not advise Gibson that his statements could be used against him at trial. Nevertheless, Gibson signed the Miranda rights card. After asking Gibson a few background questions, Martin took him to the polygraph room where the polygraph test was given.

The polygraph session lasted from shortly after 5 p.m. until 6:55 p.m. Martin told Gibson that he had showed deception during the testing and that the test results showed that Gibson had killed Inman accidentally. According to Martin, Gibson finally broke down and confessed *for the first time* that he had accidentally killed Inman in self-defense because of his homosexual advances. None of the conversations between Martin and Gibson during the polygraph session was recorded and Martin made no notes of Gibson's oral confession.

Martin and Gibson then returned to the interview room equipped with the hidden video camera. Martin told Gibson,

"You know, damn. I know you didn't deliberately kill him. I know that. What happened? Out there drinking and he made advances toward you and I know you don't like queers and you just kind of shoved him and he fell and hit his head, huh? Is that what

8

happened? Okay. You see nobody is going to burn you for that. I knew from your charts that that is what happened."

There was no verbal response by Gibson. See page 296. Martin left the room momentarily and returned with Oetinger. Martin then told Gibson,

"Timmy, I have talked to Rick here and I have told him that was an accident . . . and I told him that *if they can help you, you help them otherwise they have got to take what they have to the Grand Jury . . . Rick won't stick it to you. He is here to help you. Now like I said, you have got to help him so he can help you*".

See pages 297-298. Martin then left the interview room, whereupon Oetinger resumed his interrogation without giving Gibson his Miranda warnings. Gibson then confessed that he had killed Inman accidentally or in self-defense because of his homosexual advances. See pages 298-346. During the confession, Buxton and Oetinger questioned Gibson's account of the homicide. During that dialogue, Oetinger told Gibson, "Our purpose is to determine what happened so we can protect you just as much as everybody else but we can't go and tell whoever we have got to tell that you were 100 pecent truthful with us. Then it is only going to hurt you down the road." See page 345. This completed the playing of the videotape marked state's exhibit 2, and concluded the April 5, 1985 hearing.

The hearing resumed at 9:30 a.m. on June 3, 1985. At that time, state's exhibit 3 was shown, a continuation of Gibson's confession. During the course of the confession, Gibson gave Oetinger a saliva sample. See page 427. Gibson also drew a diagram of the crime scene. Near the end of the confession, Gibson told Oetinger, "I don't want to go to prison." Oetinger replied, "Well, I think that the State Attorney's office is going to make a decision whether it was self-defense or not." See page 429. As the confession concluded, Oetinger was able to get Gibson to acknowledge that he had been treated fairly; that no threats or promises had been made; that his statement was freely and voluntarily made; and that he had been given a sandwich and drink. The confession concluded at 8:47 p.m. on July 22, 1984. See pages 430-431.

The court then heard the testimony of the witnesses called by the state, all of which was duly reported. Buxton testified on direct examination that Gibson had invoked his right to remain silent, but immediately initiated further conversation. See page 436. On cross-examination, Buxton testified that Gibson had stated about three times before the polygraph examination that he did not wish to discuss the case, but that the interrogation did not cease. See page 449.

9

The court then heard the testimony of Martin. He testified as to the test questions used during the polygraph test and acknowledged the above paraphrase of the Miranda warnings. He also acknowledged that he had not recorded his conversations with Gibson or made any notes thereof. See pages 472-473. Martin also acknowledged that he told Gibson that his only chance was to give a statement that the killing was accidental, otherwise the case would go to a grand jury. See pages 474 and 476-480. Martin testified that he was with Gibson from 5 p.m. to 6:55 p.m. on that day, July 22, 1984. See page 475. The evidentiary hearing on the Inman case then concluded without any witnesses being called by the defense.

As noted above, the interrogation of Gibson in the Inman case ended at about 8:47 p.m. on Sunday, July 22, 1984. Oetinger then immediately delivered Gibson over to Rick Jenkins of the Palm Beach County Sheriff's Department to be questioned regarding the Bruno homicide.

### The Bruno Homicide

Just before 9:00 p.m., Sunday, July 22, 1984, Oetinger introduced Gibson to Jenkins in the same interview room with the concealed video camera described above. The interrogation that followed was videotaped and lasted until about 10:45 p.m. Jenkins read the standard Miranda rights card to Gibson at 9:02 p.m. To his credit, Jenkins did tell Gibson that he was investigating the Bruno homicide. Jenkins asked Gibson what he knew about the Bruno homicide. Gibson replied that he didn't know anything other than what he had read in the newspaper. See page 31. Jenkins told Gibson that "there was a strong possibility that the person who killed Bruno did not mean to do it, because she was a strange, unusual person." See pages 35-36. Jenkins asked Gibson, "Why did you go over to Mrs. Bruno's house," to which Gibson replied, "I wasn't over there." That denial started a long, accusatorial interrogation by Jenkins and Oetinger. Throughout the interview, Jenkins frequently touched various parts of Gibson's body. He held Gibson's arms, shoulders and neck.

Jenkins told Gibson, "We want to be fair with you and we want you to look as good as you possibly can." See page 38. Gibson persisted in his denial that he was involved in the Bruno homicide. Jenkins told Gibson that "if it has to do with you directly, then that's no problem because we can work a lot of things out." See page 42. Still Gibson denied involvement. Jenkins falsely told Gibson that he had an eyewitness who saw him "taking a leak in Bruno's yard and that saliva samples found at the crime scene would match with the samples you gave Oetinger in the Inman case, but you can't get me to help you if

10

you hold back too much longer, too much more . . . I am trying to help you, trying to give you the opportunity to tell me what it is you know about it . . . see, we're reaching the point where we need your help to help you; see if you won't help us to help you, we can't; if you won't give us a little information about it, we cannot help you." See pages 47-50. Still, Gibson repeatedly denied any knowledge of the homicide. Jenkins pleaded with Gibson, "Don't tell us you weren't there, please, don't tell us you weren't there. That looks so bad for you." See page 52. Jenkins explained the different ways a person can die, i.e. murder, accident, misadventure and self-defense. See page 54. Jenkins asked Gibson if he would be willing to take a polygraph, to which Gibson agreed even though Gibson said he did not believe in them. See page 55. Oetinger then reminded Gibson of his confession in the Inman case and said, "You didn't see us get excited when you told us and slap the handcuffs on you and run you across the street to the county jail, that we were going to charge you with murder, did you?" See page 58. Oetinger then went on at some length to explain his belief that the Bruno homicide was an accident as well. Gibson persisted in his denials, however. Eventually, Gibson said, "I'm tired. I want to go back to the jail and go to sleep." Oetinger replied, "You don't want to discuss this anymore?" Gibson answered, "No, because I don't know anything about it. I don't have any information who went in the house and tied her up and robbed her." See page 64. Nevertheless, the interrogation continued with Oetinger asking Gibson to take a polygraph test. Oetinger told Gibson, "We're willing to help you but what's going to happen, we will tell the State Attorney's office that Tim Gibson cooperated and gave us a statement. Told us what we wanted to know. Here he is, we have this evidence here and he's lying about this. What's going to happen?" See page 66. Gibson continued his denial by saying, "I'm telling the truth about it. I don't have any information on it. I'm telling the truth. I am not lying to you." Oetinger then reminded Gibson how hard it was pulling out from him the information in the Inman case. See pages 67-68.

Jenkins then took up the interrogation as Oetinger left the room, falsely suggesting to Gibson that his fingerprints and hair samples had been found in Bruno's house. See pages 72-73. Jenkins told Gibson, "A jury will believe someone who admits what happened, but would not believe someone who denies what happened." See page 73. Jenkins pleaded with Gibson to make a statement of what happened, suggesting that it was an accident. Jenkins had Gibson sign a consent for saliva sample. See page 77. The interrogation ended shortly thereafter and Gibson was returned to the jail at about 10:45 p.m., ending about 9

11

hours of constant interrogation that day. After they left the interview room, Oetinger came back in and waved goodbye to the hidden television camera, as Gibson was heard to say he had to go to the bathroom.

The next day, July 23, 1984, Martin initiated further interrogation of Gibson regarding the Bruno homicide. Martin correctly explained the Miranda card to Gibson, without reading it to him. Gibson signed the card at 8:57 a.m. See pages 81-83. The Miranda card was admitted in evidence as state's exhibit 10. Martin interviewed Gibson and gave him a polygraph examination until about 10:26 a.m. (As will be noted hereinafter, Jenkins falsely told Martin that no one had interrogated Gibson about the facts of the Bruno homicide). Upon completion of the polygraph session, Martin took Gibson to the same interview room equipped with the hidden video camera. The conversations that followed were videotaped.

The videotape, state's exhibit 3, was then played to the court. The conversations started with Martin saying,

"He doesn't like gays. As much as he doesn't like gays, they're going to have a ball with him because he doesn't want to help himself. You know, if we can only go with them, it had to be intended because he doesn't want to try to clear it up. I don't feel it was an intentional murder. They didn't go out there and brutally beat her or kick her or anything. It's something that accidentally happened, but unless he comes across, we don't have anything else to go on. Tim, good luck. It's up to you. You're going to have to talk to Jack here. You were in the house, weren't you?"

When Gibson answered "no," Martin kept saying that he was. See pages 86-87. Martin then told Gibson,

"I'm going to the Grand Jury and testify against you . . . and they will have an expert look at my charts and they'll agree with me. The preponderance of the evidence, teeth marks, fingerprints, the beer, the gum and the items that was found at the Inman death scene and what was found at the Bruno death scene, all of these are going to come down on you like a ton of bricks because you are going to sit there and say you didn't do it. See I tried last night. I think you saw a different attitude in me last night because I knew you were repenting for what you did. You're not repenting this morning. You don't give a shit this morning. You're saying fuck them, we're going to make them make their case against me. And you know, if we make a case against you, then it's harder . . . we are going to drag other people in here and they will bury you . . . they're going to be

looking for the best deal they can get and you got to think about Timothy Scott Gibson right now because if we have to make the case, then we're going to bring in the Inman thing and they're going to show, well, maybe one was accidental but not this."

See pages 86-88.

Jenkins resumed the interrogation without any further Miranda warnings being given. He told Gibson, "The only chance at survival you have is to be honest with us . . . Mrs Bruno had mental problems at times and brought a lot of problems on herself." See page 89. Jenkins also told Gibson, "We need your help to tell us exactly what happened . . . you didn't intend to kill her . . . you need to be able to tell us just how it was so that we can tell a jury so we can show that you are not a bad man." See pages 89-90. Gibson persisted in his denial of involvement. Jenkins then falsely suggested he had teeth impressions, hair samples, fingerprints, saliva samples, and blood work to prove his case, and that Gibson would be history if he didn't tell how it happened. Jenkins said, "You don't have any choice anymore . . . like last night . . . you have Mr. Inman's situation. You have Mrs. Bruno's situation . . . we are ready to go to the grand jury . . . we go to trial . . . we are talking the death penalty if you can't give us some reason, help yourself, help us . . . you'll be sentencing yourself." See pages 90-91. Again Jenkins reminded Gibson of the death penalty, but said "I don't want that for you." See pages 92-93. Still, Gibson denied any knowledge of the Bruno homicide. Jenkins continued to plead with Gibson, saying his "supervisors are breathing down my neck to charge you . . . I can't stand the thought of seeing a young guy like you go to the electric chair because you are too silly not to tell us what happened." See pages 93-94. At this point, Gibson finally began to confess his involvement, but said he didn't know the names of his confederates. Jenkins then told Gibson, "You'll go to the electric chair if you don't give us the names of them." See page 98. Jenkins asked Gibson to "pray with me, son . . . please do you believe in God, pray with me." See page 99. Gibson then named Sean Barlow and James Anderson as his confederates. See page 100. He specifically denied that Woods was involved.

Later in the interrogation, Jenkins told Gibson he didn't believe Barlow and Anderson participated, but that Woods did. Gibson reacted by replying, "Alright, there ain't no Sean or James. I lied. I was lying about the whole damn thing . . . I wasn't even there." See page 148. Jenkins repeatedly begged Gibson's apology, offering to shake hands, and begged Gibson not to retract his admissions, saying, "If you say it was Sean and James, it was Jim and Sean." See pages 149-151.

13

Gibson then drew a diagram of the Bruno home. See pages 152-159. The interrogation concluded at 12:10 p.m. after Gibson agreed to go to the scene with Jenkins later that same day. See page 169.

Later that same day, July 23, 1984, Gibson was taken to the Bruno home for a videotaped tour of the crime scene. The videotape was introduced in evidence as state's exhibit 9. The videotape started off with Strenges announcing the time to be 1:58 p.m. He read a standard Miranda rights card to Gibson who was standing there in jail clothes, handcuffed. Gibson signed the Miranda card. See pages 14-17. Strenges repeatedly asked Gibson to tell what he did during the Bruno homicide and told him that it would be helpful to Gibson. However, Gibson refused to participate and remained silent. See pages 18-22. The camera was then turned off for some unknown period of time. (Jenkins tried to persuade Gibson, off camera, to reconsider and participate, according to the testimony of Strenges summarized hereinafter.) At about 2:10 p.m., when the camera came back on, Jenkins and Gibson were standing there with Jenkins repeatedly asking Gibson to participate. Gibson said nothing. The camera went off again. When it came back on, Strenges and Gibson toured the Bruno home, but there was no sound on the videotape. The tape lasted about 21 minutes. (At that time, Gibson was still contending that Barlow and Anderson were his confederates.)

The court then heard a cassette tape admitted in evidence as state's exhibit 5 made on July 24, 1984 beginning at 12:30 p.m. and ending at 12:44 p.m. The cassette tape consisted of a conversation between Strenges and Gibson. See pages 30-31. No Miranda warnings were given to Gibson at that time, but Strenges reminded Gibson, "You are still under your rights." During the taped statement, Gibson named Woods and Dority as his confederates in the Bruno case *for the first time* on tape, and described the events of the crimes.

On July 25, 1984 at 9:09 a.m., a second videotaped tour of the Bruno home was conducted by Strenges and Gibson. This tape not only had video pictures, but audio sound as well. However, no Miranda warnings were given to Gibson on the videotape. The videotape was admitted in evidence as state's exhibit 7. Gibson answered the questions put to him by Strenges, detailing the events of the Bruno case, naming Woods and Dority as his confederates, and toured the Bruno home with Strenges. See pages 174-187. The videotape ended at about 9:39 a.m. The court then heard another cassette tape admitted in evidence as state's exhibit 8 made on July 25, 1984 at 9:09 a.m. The tape consisted of a conversation between Strenges and Gibson that was made simultaneously with the videotaped tour of the Bruno home on

14

July 25. No Miranda warnings were given to Gibson on the tape. See pages 50-58.

As far as I can determine from the hearing transcripts and my notes, the above summary covers all the videotapes and cassette tapes made by Gibson in the Bruno case. The confusion is caused by the fact that the tapes were not presented in the chronological sequence in which they were made. The confusion is further exacerbated by the sheer number of videotapes and cassette tapes and their extreme length. I will now summarize the testimony of the witnesses who testified at the evidentiary hearings in this case.

William Martin was the first witness called by the state. See page 73. He testified that he met Gibson on July 23, 1984 and explained a Miranda rights card to him, marked in evidence as state's exhibit 10, without reading it to Gibson. Gibson signed the card at 8:57 a.m. See pages 81-83. As noted above, this was the day that he conducted a polygraph examination on Gibson covering the Bruno homicide, after which he took Gibson to Strenges and Jenkins for the further interrogation summarized above. Martin also testified that he had attempted to question Gibson again at 6:30 p.m. on July 25, 1984 to see if he could get him to confess to any more crimes, but Gibson refused to make any more statements to him. See pages 86-88.

On cross-examination, Martin testified that before he conducted his July 23 polygraph exam on the Bruno homicide, Jenkins had told him that no one had interrogated Gibson about the Bruno case. Of course, this was a gross misrepresentation by Jenkins. Martin testified that the misrepresentation would invalidate the result of his polygraph exam of Gibson. See pages 89-92 and 100-102.

The next witness called by the state was Jack Strenges. See page 104. He testified that his first contact with Gibson was on July 23, 1984 about 8:30 a.m. when Gibson was brought from jail to take a polygraph exam on the Bruno case. See pages 105-107. Strenges also testified that he took Gibson to the Bruno home on the afternoon of July 23 to videotape a tour of the home. He testified that when he read Gibson his rights on camera, Gibson refused to participate and remained silent. See pages 108 and 120-123. Strenges said the videotape tour was then terminated. His next contact with Gibson was the next day, July 24. This contact was initiated by Strenges, and not by Gibson. See page 122. See also pages 46 and 48-50. Strenges read a standard Miranda rights card to Gibson at 8:38 a.m., state's exhibit 6 in evidence. He also read a standard Miranda rights card to Gibson which he signed at 9:52 a.m., state's exhibit 4 in evidence. Gibson then

**15**

accompanied Strenges and Jenkins to the Bruno home where he participated in a videotaped tour of the home, answering questions, naming Woods and Dority as his confederates. See pages 112-113.

On cross-examination of Strenges, he testified that he was lead investigator in the Bruno case and Jenkins was his assistant, and that it was he (Strenges) who arrested Gibson for the Bruno homicide. Strenges acknowledged using deception and trickery in the various interrogation techniques used to obtain Gibson's confession, including avoidance of the electric chair technique, making it clear to Gibson that his confession was needed before he and Jenkins could help Gibson. See pages 16-26 and 29-30. Strenges testified in response to the court's questions that no one from the State Attorney's office ever saw or heard any of the videotapes or cassette tapes of the Bruno homicide before the case went to the grand jury, and that the grand jury did not see or hear them either. See pages 43-44. Strenges further testified in response to the court's questions that there is no physical evidence at all to connect Gibson to the Bruno homicide. See pages 54-55 and 57-59. Strenges testified, in response to Nelson Bailey's question, that immediately after Gibson refused to participate in the videotape tour of the Bruno home on July 23 Jenkins tried to persuade Gibson to participate, but again Gibson refused. See pages 60-61.

At the conclusion of the state's evidence, the defense presented no testimony or other evidence. This now concludes all the evidence relating to Gibson's motions now before the court in the Bruno case. This court will now address the motions filed by Dority in the Bruno case.

Dority's motions came on for an all day evidentiary hearing on April 1, 1985. As to the Motion to Dismiss the sexual battery charge in count three of the indictment, the prosecutor refused to consent to the motion in spite of the fact that this court had previously granted an identical motion filed by Gibson. See the order filed on January 14, 1985 granting Gibson's identical motion. The State Attorney had appealed that prior order, but the appeal was dismissed when the Attorney General filed a Notice of Voluntary Dismissal, apparently because the appeal had no merit. Therefore, Dority's attorney, Douglas N. Duncan, introduced into evidence (by stipulation) pages 31-37; 56-58; and 59-60 of the deposition given by Dr. John Marraccini, Associate Medical Examiner of Palm Beach County. No other evidence was presented in support of or in opposition to the motion to dismiss. Dr. Marraccini had testified that he found no physical or scientific evidence at the scene or during the autopsy that would show that a sexual battery had taken place. At the close of the evidentiary hearing, this

16

court granted the motion to dismiss for the reasons stated on the record. This court had found that the state did not have sufficient evidence to make a prima facie showing that a sexual battery had occurred, except for the confession. In other words, the state could not prove the corpus delecti of sexual battery independent of the confession. *Mitchell v. State*, 33 S. 1009 (Fla. 1903) and *Vallaincourt v. State*, 288 So.2d 216 (Fla. 1974). Apparently, the state has not appealed the oral order granting Dority's motion to dismiss.

The first witness called by the state in opposition to the motion to suppress was Jack Strenges. He testified that on July 23, 1984 he and Jenkins went to the Juvenile Detention Center of Palm Beach County to speak with Dority. At that time, Dority was being detained at the center on a charge of burglarizing Murphy's Towing. Upon arrival at the center, Strenges was told that Dority refused to speak with him. Nevertheless, Richard Oetinger and Jenkins initiated a second trip to the center in the evening of July 23, 1984. On that occasion, they brought Dority to the Sheriff's Administration Building where a custodial interrogation of Dority took place. At that time, Dority had already been appointed a public defender by the juvenile court. However, no notice had been given to the public defender and no court order had been obtained from the juvenile court before Dority was transported to the Sheriff's office building for interrogation. Jenkins read a standard Miranda rights card to Dority. At that time, Dority was not told that he was a suspect in any crime, but was led to believe he was being questioned only as a witness regarding Gibson's possible involvement in the Inman homicide. Dority signed the card at 7:13 p.m. and the interrogation lasted until about 10:41 p.m. See the card in evidence as state's exhibit 1. The conversation was recored on cassette tapes with the knowledge of Dority. According to Strenges, Oetinger spoke ith Dority about Gibson and the Inman homicide for about 40 minutes. Then, Strenges began to talk with Dority about the Bruno homicide on cassette tapes, but later switching to the hidden video camera described hereinabove. Strenges testified that no threats or promises were made as to either homicide and that Dority never asked for an attorney or to terminate the interrogation.

The state then played a cassette tape marked state's exhibit 2 in evidence. The tape started .off by Dority acknowledging that he had voluntarily accompanied the officers without threat or promise. Oetinger told Dority that he (Oetinger) knew all the facts of the Inman homicide because Gibson had confessed. Oetinger asked Dority to tell him what Gibson had told him about the case. Dority said that he and Gibson were at their home watching television about noon one day

**17**

when the news came on "about a murder of a man who got shot." He said Gibson jumped up and turned off the television. When Dority asked Gibson why he had done that, Gibson said, "I don't want to hear about a murder." According to Dority, Gibson asked him if he had heard about "a black faggot getting shot on Belvedere Road"; and told Dority, "I gave the faggot a shot between the eyes." Dority said Gibson wouldn't tell him where he had gotten the gun he used. (Inman had not been shot with a gun, but had been hit in the head with a blunt object or club.)

. Thereafter, Oetinger questioned Dority about who Gibson hung around with, about the Galaxy Skating Rink, and Barney's Place. Oetinger asked Dority if he would take a polygraph examination concerning what Gibson had told him of the Inman homicide. Although Dority agreed to do so, he was never given the test. Oetinger then began to tell Dority that he was not telling everything he knew. Oetinger told Dority, "You're our witness, I'm not trying to tie you up in this . . . Tim told me he killed the black guy and I don't understand why you are clamming up . . . there's something else on your mind." Dority replied, "There's nothing on my mind." Oetinger then told Dority, "I told you we would do what we could for you. I'll let you think about it for a while," as the first side of the cassette tape ended at 7:35 p.m.

When the second side of the cassette tape was played, Strenges asked Dority if he had ever been out on Skees Road. Dority said he had visited the home of the Woods family who lived in the area of Skees Road. Strenges then began to question Dority about his knowledge of the Bruno homicide. Dority said he had no knowledge other than neighborhood talk and what was on "Crime Stoppers." Dority denied ever having seen Bruno or ever having been in her home. Jenkins then told Dority, "The killing was probably an accident." Dority replied that he had not heard that before. No fresh Miranda warnings were given.

Jenkins then told Dority, "We do all our investigation before we ever contact anyone; we don't bluff people; *we don't bust people's chops because of the way the courts are*; we already know the truth and we want you to be honest . . . we don't want you to look bad by trying to protect yourself, Buddy or Tim, so tell us what you know." Dority replied, "That's all I know, Tim said he heard she got tied up to a chair and strangled or suffocated or something."

Strenges then told Dority, "We found things at the scene that will tell us who was there . . . you've got to help yourself, the woman was

18

■■■■■■■

killed by accident . . . if you have information without telling us, it will not help you or us . . . this can help you out of the jam you are in now, I can go to bat for you." Dority replied that he had not heard anything about who killed Bruno. Strenges then said to Dority, "You have a nice mother and family, your life is ahead of you, do you believe in God, its a sin to murder, 80 years from now you'll meet your maker and he'll say you screwed up . . . you'd be pissed if something happened to your mother . . . be a leader, not a follower like the other assholes at DYS . . . this is the greatest thing to help you out . . . what do you know, tell me, I'll help you out." Strenges pleaded with Dority, but all he got was a long silence.

Strenges then pressed Dority asking, "What did Tim tell you—that he killed her, is that what he told you?" Dority then told Strenges that Gibson had told him he had "robbed some old lady on Skees Road, tied her up, got a lot of money and then left, but did not kill her, and did not say if anyone was with him." That ended the playing of that cassette tape.

As the next cassette tape, state's exhibit 3, was played Dority told Strenges that Gibson had told him about the Bruno homicide at their home, and that he had seen Gibson come home with a roll of duct tape and $150-$200 on the day of the homicide. He said Gibson told him, "I will be mad if you tell anyone." The tape ended at about 8:30 p.m. just after Dority acknowledged that he had been treated well by the investigators, without any threats or promises. The prosecutor then stated on the record in open court that none of the above tapes by Dority would be offered in evidence against Dority at trial, but were merely offered to show the totality of circumstances. The court then recessed the evidentiary hearing for lunch.

The hearing resumed at 1 p.m., after lunch. At that time, the court heard the remaining portion of exhibit 3. Strenges told Dority, "Oetinger showed you a couple of things, what did he show you . . . you might have tried to snow me, bullshit me, pull the wool over my eyes, were you there?" Dority replied, "No." At this point, counsel stipulated that the remainder of the interrogation would be on videotape, state's exhibit 6.

The videotaped interrogation took place about 8:27 p.m. in the same interview room described above. No Miranda warnings were given on the videotape. Jenkins, Strenges and Dority were seated at a table, with Dority sitting at the corner against a wall. Strenges was seated next to Dority. Unfortunately there is no transcript of the videotape, and the court must rely upon its handwritten notes made at the time the videotape was played in court.

19

Throughout the interrogation, Jenkins frequently touched various parts of Dority's body, grabbing his arms, shoulders, elbow and rubbed his neck. Jenkins told Dority, "Don't make yourself look bad . . . Tim was in the same seat today . . . if you were there, we want to help . . . don't hold the truth back, it is hurting you bad." Dority said, "I wasn't there." Strenges replied, "What if we put you on a polygraph, it worked on Tim." Jenkins then falsely suggested to Dority that his fingerprints, teeth impression, saliva, hair samples and sperm had been found at the crime scene. He told Dority, "We have a lot of physical evidence . . . your eyes are filling with tears, saying oh, God, don't let them charge me . . . if you don't give your side, all we have is what Tim and others have said . . . we know you were there, trust us, you need help and we will help you, don't hold back, you're hurting yourself," as Strenges held Dority by the shoulder.

Jenkins said, "My job is to help you, I know a 16 year old didn't plan this." Strenges asked, "It was a mistake, wasn't it? We're not going to stop." Jenkins then said, "Tim is going to jail . . . you're not under arrest for Bruno yet (emphasizing the "yet"), you understand 'the yet'? First degree murder carries the death penalty, big chips . . . why are you going to do time, lack of intelligence or trust? . . . If you hold it back, you're going to hurt yourself, you're talking first degree murder unless you tell us otherwise, i.e. you went in to rip her off and things got out of hand. What do you think your mother will think if you hold this in and the hammer drops? . . . You will be tried as an adult and there is a death penalty for adults . . . Whose idea was it at first?" Dority did not answer, but just sat there in silence.

Strenges then stated, "You know you were there." Dority replied, "No I don't." Jenkins then grabbed Dority's left elbow and said, "Yes, you were, do you want us to put you under arrest and put you in a cell?" Strenges and Jenkins then began to argue with Dority. Jenkins said, "We're talking first degree murder and your life, living and dying, but I'm not trying to get you to say something . . . she was a crazy old woman. Whose idea was it at first, tell me son." Dority did not answer. Strenges and Jenkins pleaded with Dority to answer. Strenges said, "All you want to say is no, no, no, not even counting the physical evidence and testimony from Tim, all this shit put on you," as he patted Dority's hand pleading, "Come on, tell us." Strenges asked, "It was Tim's idea, wasn't it?" Dority silently shrugged his shoulders.

Jenkins then said, "We're not playing games, this is not Hawaii 5-O, you won't think it is funny when you face what Tim is saying and the physical evidence. If you want to piss your life away, go ahead." Jenkins and Strenges continued to plead with Dority. Jenkins said,

"Tim is going to jail, Strenges is going to arrest him for the Bruno murder." At this point, Strenges leaned over into Dority's face and said, "This is the most important thing in your life, it is not so bad we can't help you." Dority remained silent.

Shortly thereafter, Dority broke down and tearfully confessed, giving the details of the Bruno episode. Jenkins suggested to Dority that "she was a crazy lady, yelled, screamed like a witch." Jenkins had Dority draw a diagram of the creme scene, which Dority signed at 9:24 p.m. Jenkins told Dority, "You've done real good and you've helped yoursef," asking Dority to tell him what Clyde Woods did. Dority complied, as Jenkins held Dority's right hand. He also held Dority's right shoulder with his left hand as Dority described how Gibson and Woods had intercourse with Bruno's body. At 9:40 p.m., Dority was asked to go over it again because of trouble with the cassette tape recorder that was being simultaneously used.

Jenkins and Strenges both shook hands with Dority as they tried for some time to get him to admit he too had intercourse with Bruno's body. Jenkins told Dority that "a young man's penis can get hard just driving down the street." Dority finally admitted he had looked at a Playboy magazine Gibson had brought to the Bruno home, got an erection and then had sex with Bruno for about 5 minutes. The interrogation ended at 9:50 p.m. with Dority acknowledging that he had been "treated o.k., without threat or promise."

The state then played a cassette tape, state's exhibit 5. The tape was made on July 23, 1984 at 10:36 p.m. The tape started off with Dority acknowleding that he had been advised of his rights earlier. Oetinger asked Dority, "Was it three or six people that had sex with Bruno?" Dority replied, "Six." Oetinger asked Dority, "Why change it?" Dority replied, "Cause I'm tired of being here. It was Larry Craigo, St. Clair and a guy named Mitchell." Strenges asked Dority, "What if I drag them in and they deny they were there, proving that you were lying?" Oetinger then asked, "Were they there?" Dority did not answer the question. That cassette tape ended at 10:41 p.m. State's exhibit 4 is a cassette tape that was made simultaneously with the videotape, exhibit 6. Therefore, it was not played to the court during the evidentiary hearing. The court will now summarize the testimony of the witnesses who were thereafter called by the state and defense.

Strenges was called by the state to explain that Dority had retracted his claim that Craigo, St. Clair and Mitchell had participated in the Bruno case. He said Dority made it up because "he had been tired of talking with us." The state then introduced the Dority diagram in evidence.

On cross-examination, Strenges admitted that there was no physical evidence in the Bruno case that would lead him to any suspect and there were no witnesses or other leads. Therefore, the Bruno homicide was put on inactive status until Gibson became a suspect and was questioned on July 22, 1984. Upon learning that Gibson lived with Dority and his mother, Nancy McIntyre, Dority then became a suspect in the Bruno case even though Gibson had not yet named Dority as having been involved. Strenges acknowledged that Dority refused to talk with him and Jenkins at the Juvenile Detention Center on the afternoon of July 23, 1984. Later that same day, Strenges went to the McIntyre residence to search Gibson's room pursuant to Gibson's written consent. Strenges told McIntyre that Dority was being brought in for questioning as a witness against Gibson in the Inman case. Strenges drove McIntyre to the sheriff's office at about 6:30 p.m. Upon arrival at headquarters, the interrogation of Dority by Oetinger and Jenkins was already in progress. Strenges falsely told McIntyre that he did not know where the interrogation was taking place. According to Strenges, McIntyre was then told that Dority was a suspect in the Bruno case, but she was not given a chance to see her son. Strenges testified that Dority was not told that his mother was in the building.

Strenges testified that he frequently touched Dority as a part of his interrogation technique. He admitted that he told Dority that Gibson had named him as a participant in the Bruno case and that Dority's hair samples, semen, saliva and fingerprints were found in the Bruno home, all of which was false. Strenges testified that after the interrogation was concluded, Dority was returned to the detention center about 11-11:30 p.m. Strenges testified that he formally arrested Dority on July 24, 1984 after Woods and Gibson had confessed, naming Dority as a participant in the Bruno case.

The first witness called by the defense was Dority's mother, Nancy McIntyre. She testified that officers had come to her home between 5:30 and 6:30 p.m. on July 23, 1984 to search Gibson's room, which she allowed. She said the officers asked her to accompany them to the sheriff's office regarding a homicide in which Gibson was a suspect. She testified that en route to the sheriff's office, the officers told her that her son would be there because he may be a witness to "the homicide" they were investigating, and asked her to speak with Dority and get him to cooperate.

McIntyre testified that while at the sheriff's office, a detective Marvin asked her several questions about Gibson, but no mention was made about her son being a suspect in the Bruno case. She testified that at about 8:30 p.m. she asked Marvin if she could speak with her son, but

22

was told "they're quite involved and can't be disturbed." She testified that had she known that her son was a suspect she would have instructed Dority not to make any statements without his court appointed public defender, John Conway, being present. McIntyre testified that Dority called her from the detention center on July 24, 1984 "all distraught because he had been questioned about murders he didn't know anything about, saying he made up stories to get the officers off his back, telling them what they wanted to hear." She said that Dority told her he had tried to kill himself.

On cross-examination, McIntyre testified she was present at the detention center when her son was arrested at 7:10 p.m., July 24, 1984 on the Bruno homicide. She testified that Dority did not do well in Greenacres Elementary School, and the last grade he attended was the eighth grade. As a result she had requested that Dority be tested for learning disabilities. She said the Juvenile Court ordered two psychological tests, but that she did not know the results.

Dr. Mary Jo Thomas, a psychiatrist, testified that she saw Dority on October 12, 1984 pursuant to a juvenile court order and found him competent to stand trial. Dr. Thomas is of the opinion that Dority has "low ego strength, low sense of will power, of self and of self-determination." Dr. Thomas testified that she viewed the videotapes 4-6 times and that "the officers had a very effective technique that could be called brain-washing, evangelistic persuasion or faith healing techniques." She said, "The confession is not necessarily the product of Dority's free will."

On cross-examination, Dr. Thomas said she saw Dority in her office where she did a clinical examination, but no written psychological examinations. She said that Dority has a normal range of intelligence, but had a poor ability to communicate with her; that Dority is easily led, persuaded or pushed to be consistent with the mood of his examiner, attributed mostly to his mental condition rather than his youth.

Christopher Dority testified that he is now 17 years of age and is in the eighth grade. He said that he has viewed the videotapes in his lawyer's office. He testified that "I made the statements because that was the only way to get out, and did not know that I could break off the interview. I just told them what they wanted to hear, after 4 hours." He said, "When I was first brought in I was told they wanted to ask me about Gibson and the Inman homicide, but was not told that I was a suspect in the Bruno case."

On cross-examination, Dority testified that, "I did not really under-

**23**

stand my rights when Jenkins read them to me, and I thought I had to talk with police officers. I wanted to stop." This concluded the presentation of the evidence as to Dority's motions.

It should be noted that at the time of the homicides, Woods was 14 years old and was in the 7th grade. Dority was 16 years of age and was in the 8th grade. Gibson was 18 years of age and had completed the 9th grade. Woods was formally arrested in the Bruno case on July 24, 1984. Gibson was formally arrested in both cases on July 25, 1984 at 10:20 a.m. Strenges booked Gibson on a charge of first degree murder in the Inman, but the State Attorney filed the charge as second degree murder.

## CONCLUSIONS OF LAW

Since as far back as 1897, the U.S. Supreme Court has held that a confession can never be received in evidence where the prisoner has been influenced by any threat or promise, direct or implied, however slight, because the law cannot measure the force of the influence used, or decide its effect upon the mind of the prisoner. *Bram v. United States*, 18 S.Ct. 183, 187 (1897). The state has the burden of showing the voluntariness of a confession. *State v. Chorpenning*, 294 So.2d 54 (2 DCA 1974). The quantum of proof the state must meet is by a preponderance of the evidence. *Brewer v. State*, 386 So.2d 232 (Fla. 1980). In making that determination, the truth of the confession is not to be considered by the court. *Jackson v. Denno*, 84 S.Ct. 1774 (1964).

Juvenile confessions have always been held to be admissible, though the courts have necessarily regarded them with closer scrutiny because of the age of the person involved. See *Doerr v. State*, 348 So.2d 938 (2 DCA 1977) approved in 383 So.2d 905 (Fla. 1980); *T.B. v. State*, 306 So.2d 183 (2 DCA 1975) and *State v. Francois*, 197 So.2d 492 (Fla. 1967). The admissibility of a juvenile's confession must be determined by the totality of the circumstances under which it was made. *Gallegos v. Colorado*, 82 S.Ct. 1209 (1962). Therefore, clearly a minor has the capacity to make a voluntary confession, even of capital offenses, without the presence or consent of counsel or other responsible adult. The admissibility of such a confession depends not on his age alone but on a combination of that factor with such other circumstances as his intelligence, education, experience, and ability to comprehend the meaning and effect of his statement; but if the confession stems from custodial interrogation, the defendant must also be given his Miranda rights. The state has the heavy burden to show that the defendant voluntarily, knowingly and intelligently waived those rights. See *Tague v. Louisiana*, 100 S.Ct. 652 (1980); *T.B. v. State*, 306 So.2d 183 (2

24

DCA 1975); *Tennell v. State*, 348 So.2d 937 (2 DCA 1977); *Hall v. State*, 421 So.2d 571 (3 DCA 1982); and *Arnold v. State*, 265 So.2d 64 (3 DCA 1972). The more immature the juvenile may be, the greater likelihood exists that his confession will be deemed inadmissible. The fact that a juvenile's confession was given before he had the opportunity to talk with his parents or an attorney is certainly a factor militating against its admissibility, but does not preclude a finding of voluntariness depending on all the other circumstances surrounding the confession. *Doerr v. State*, supra.

If a defendant indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease—the critical safeguard is a person's "right to cut off questioning." See *State v. Dixon*, 348 So.2d 333 (2 DCA 1977). The police must "scrupulously honor" a suspect's right to end interrogation, but the interrogation may resume after the passage of a significant period of time and after the giving of fresh Miranda warnings. See *State v. Isaac*, 10 FLW 827 (2 DCA 1985) citing *Michigan v. Mosely*, 96 S.Ct. 321 (1975).

Where a mentally competent and aware defendant has been given his appropriate Miranda rights and has not been placed in fear of material or physical harm or given hope of material reward, the interrogating officers may use methods of interrogation psychologically effective to break down the defendant's will not to confess. *Barnason v. State*, 371 So.2d 680 (3 DCA 1979). See for example the interrogation technique used in *Burch v. State*, 343 So.2d 831 (Fla. 1977). But compare *DeConingh v. State*, 433 So.2d 501 (Fla. 1983), where it was held that the confession was the product of psychological coercion rather than of free intellect. Compare also *Ware v. State*, 307 So.2d 255 (4 DCA 1975), where the appellate court held that a defendant's confession was involuntary because the police used a "wily approach involving his family" to induce the confession, in other words, the so-called "family approach" technique. If the confession is extracted by any sort of threat or violence, or is obtained by any sort of direct or implied promise, however slight, or by the exertion of any improper influence, it must be suppressed as invalid even though Miranda warnings were given. *M.D.B. v. State*, 311 So.2d 399 (4 DCA 1975) and *Hawthorne v. State*, 377 So.2d 780 (1 DCA 1979). Furthermore, where the interrogating officers employ two or more courses of conduct against a defendant in their interrogation, using lies, threats and promises of leniency, the confession must be suppressed as involuntary, as an unconstitutional abridgement of the defendant's Fifth Amendment and due process rights. *Williams v. State*, 441 So.2d 653 (3 DCA 1983).

25

Where a confession is obtained by a law enforcement officer by raising the spectre of the electric chair, suggesting that he has the power to effect leniency, and suggesting to the suspect that he would not receive a fair trial, the confession is deemed coerced and must be suppressed. Such declarations are calculated to delude the suspect as to his true position or to exert improper and undue influence over his mind. See *Brewer v. State*, 385 So.2d 232 (Fla. 1980). Furthermore, once it is established that there were coercive influences attendant upon an initial confession, the coercion is presumed to continue unless clearly shown to have been removed prior to a subsequent confession. The mere readings of the Miranda rights prior to any subsequent confession is not sufficient to dissipate the taint of the initial coerced confession. The state must carry the heavy burden to show, under the circumstances, that the influence of the coercion that produced the first confession was dissipated so that the second confession was the voluntary act of a free will. *Brewer*, at page 236.

Questioning of a suspect is often indispensible to crime detection. Nevertheless, our society is strongly committed, under our Constitution, to the principle that an accused person cannot be forced or compelled to convict himself out of his own mouth. Since the suspect is surrounded by known hostile forces, the risk is great that the police will accomplish behind their closed doors precisely what the demands of our legal order forbids; make a suspect the unwilling collaborator in establishing his own guilt. This they may accomplish not only with ropes and a rubber hose, not only by persistent relay interrogation, insistently subjugating a tired mind, but by subtler means. However, neither the body nor the mind of a suspect may be twisted until he breaks. See *Columbe v. Connecticut*, 81 S.Ct. 1860 (1961).

Psychological coercion renders a confession involuntary. Whether psychological coercion exists depends upon a weighing of the circumstances of pressure against the power of resistance of the person confessing. What would be overpowering to the weak of will or mind might be utterly ineffective against an experienced criminal. See 14 Jur.2nd, page 234. Where the police have exhorted a suspect to be totally honest and tell all, inferring a promise of a benefit in return, a successive confession must be suppressed as involuntary. See *K.H. v. State*, 418 So.2d 1080 (4 DCA 1982) where Judge Letts wrote,

"It is utterly consistent with any child's upbringing to suppose he can escape punishment by truthfulness and candor. Accordingly, we are of the opinion that the child, once having been programmed to believe that complete honesty would solve his dilemma while lies

26

would compound it, was entitled to assume that honesty would be his best policy."

Therefore, based on the totality of the circumstances surrounding the custodial interrogations of Gibson and Dority and on the case law cited herein, it is

ORDERED AND ADJUDGED as follows:

As to case number 84-4824 CF (the Inman homicide), Gibson's motion filed on March 5, 1985 is granted in its entirety for the joint and alternative reasons as follows:

1. The state has failed to meet its burden of proof by any standard. *Tague v. Louisiana*, 100 S.Ct. 652 (1980).

2. When the initial custodial interrogation of Gibson began at about 1:57 p.m. on July 22, 1984, Buxton did not tell Gibson that he was a suspect in the Inman homicide until well after Gibson had signed the Miranda card. When the interrogation began to focus on Gibson's alleged involvement in the Inman homicide, no fresh Miranda warnings were given to Gibson. Therefore, Gibson did not knowingly and intelligently waive his rights to counsel and to remain silent. *Miranda v. Arizona*, 86 S.Ct. 1602 (1966).

3. Even if Gibson had validly waived those rights initially by signing the Miranda card, Gibson clearly attempted to terminate the interrogation no less than four times when he said, "I ain't saying nothing"; "I ain't saying a damn thing"; "I don't even want to talk to you about this stuff because I don't want to have nothing to do about it" and "I'd rather not talk about any of this stuff as I don't have nothing to do with this stuff." In doing so, Gibson effectively invoked his right to remain silent. See *Burns v. State*, 10 FLW 904 (3 DCA 4/9/85), where that appellate court held that a defendant's statement, "I ain't making no statements," in response to being told of the charges against him, was an exercise of his right to remain silent. Nevertheless, Gibson's interrogators did not scrupulously honor his right to end the interrogation. *State v. Dixon*, 348 So.2d 333 (2 DCA 1977) and *Michigan v. Mosely*, 96 S.Ct. 321 (1975).

4. Gibson's initial videotaped statement was not freely and voluntarily made. Oetinger told Gibson, "We are here to help you" and that if Gibson did not cooperate by giving information, the case would be treated as an intentional murder rather than as an accident, constituting both a promise and a threat. *Bram v. United States*, 18 S.Ct. 183, 187 (1897) and *Williams v. State*, 441 So.2d 653 (3 DCA 1983).

5. Gibson did not knowingly and intelligently waive his Miranda

**27**

rights when he signed the Miranda card for Martin during the July 22, 1984 polygraph session. The warnings given by Martin violated both the spirit and letter of *Miranda v. Arizona*. Martin effectively told Gibson that if he asked for an attorney, he would not be given any help on the Inman case; that an attorney could not be provided until Gibson went to court; that if Gibson refused to answer questions, the interrogation would not cease; and Gibson was not told that his statements could be used against him. Therefore, Gibson's oral confession to Martin was involuntary and is inadmissible under *Miranda v. Arizona*.

6. The videotaped confession that immediately followed the polygraph session was the fruit of the poisonous tree because no fresh Miranda warnings were given to Gibson. *Wong Sun v. United States*, 83 S.Ct. 407 (1963). Furthermore, that videotaped confession was not freely and voluntarily given. On the contrary, it was induced by direct and implied promises such as "We are here to help you" and "We can protect you." *Bram v. United States* and *Williams v. State*, supra.

7. The tangible evidence obtained from Gibson as a result of his statements and confession must be suppressed as the fruit of the poisonous tree. *Wong Sun v. United States*.

As to case number 84-4824 CF (the Bruno homicide), Gibson's motion filed on January 24, 1985 is granted in its entirety for the joint and alternative reasons as follows:

1. The state has failed to meet its burden of proof by any standard. *Tague v. Louisiana*.

2. The videotaped confession in this case began at 9:00 p.m. on July 22, 1984 and was inextricably tied to the tainted confession in the Inman homicide. Therefore, this confession must be suppressed as the fruit of the poisonous tree. *Wong Sun v. United States*. The fact that Jenkins gave Gibson fresh Miranda warnings was not sufficient to dissipate the taint. *M.D.B. v. State*, 311 So.2d 400 (4 DCA 1975) and *Brewer v. State*, 385 So.2d 232 (Fla. 1980).

3. During the interrogation, Gibson effectively exercised his constitutional right to terminate the interrogation and to remain silent when he said, "I'm tired. I want to go back to jail and go to sleep." Oetinger then asked Gibson, "You don't want to discuss this anymore," to which Gibson replied, "No, because I don't know anything about it." Nevertheless, Gibson's right to terminate the interrogation was not scrupulously honored. *State v. Dixon* and *Michigan v. Mosely*. Instead, the interrogation continued until about 10:45 p.m., without Gibson making any admissions.

4. The next morning, July 23, 1984 at about 8:57 a.m., Martin initiated further contact with Gibson in violation of *Michigan v. Mosely* for the purpose of giving Gibson a polygraph examination on the Bruno homicide. The mere reading of fresh Miranda warnings to Gibson at that time was not sufficient to dissipate the taint of that illegal contact. *M.D.B. v. State.* Any statements made to Martin must be suppressed.

5. The videotaped confession that followed was not the product of Gibson's free will and intellect, but rather was induced by countless lies, promises and threats, amounting to psychological coercion sufficient to overcome his free will and to delude him as to his true position. 14 Fla. Jur.2nd, page 234. Jenkins repeatedly raised the spectre of the death penalty unless Gibson confessed. *Brewer v. State.*

6. During the initial videotaped tour of the Bruno home which began at 1:58 p.m. on July 23, 1984, Gibson invoked his constitutional right to remain silent, but Strenges and Jenkins did not scrupulously honor Gibson's right to remain silent and his refusal to participate in the videotaped tour of the home. *State v. Dixon* and *Michigan v. Mosely.*

7. On July 24, 1984 at 12:30 p.m., Strenges initiated further contact with Gibson and obtained a cassette tape recording of Gibson's confession to the Bruno homicide, naming Woods and Dority as his confederates. The fact that Strenges reminded Gibson, "You are still under your rights" was not sufficient to dissipate the taint of all the prior illegalities just enumerated above. *State v. Dixon* and *Michigan v. Mosely.*

8. On July 25, 1984 at 9:09 a.m., Strenges initiated further contact with Gibson and conducted a second videotaped tour of the Bruno home, simultaneously recording the conversation on cassette tape. No Miranda warnings were given to Gibson on videotape. Even if the warnings were given off camera, the mere reading of the warnings was not sufficient to dissipate the prior illegalities just enumerated. *State v. Dixon* and *Michigan v. Mosely.*[1]

9. The tangible evidence obtained from Gibson as a result of his statements and confession must be suppressed as the fruit of the poisonous tree. *Wong Sun v. United States.*

As to the case number 84-4825 CF (the Bruno homicide), Dority's

---

[1] Apparently the prosecutor, Frank Scott, agrees that all the videotaped tours of the Bruno home (including the simultaneous cassette tapes) should be suppressed, according to the proposed order he filed.

motion filed on January 21, 1985 is granted in its entirety for the joint and alternative reasons as follows:

1. The state has failed to meet its burden of proof by any standard. *Tague v. Louisiana.*

2. Dority did not knowingly and intelligently waive his rights to counsel and to remain silent when he signed the Miranda rights card at 7:13 p.m. on July 23, 1984. Prior to Dority signing the card, Oetinger had told him that he was only being questioned as a witness against Gibson in the Inman case and not as a suspect. The conversation that followed was recorded on cassette tape and ended at 7:35 p.m. Shortly thereafter, Jenkins abruptly switched the conversation to a custodial interrogation of Dority as a suspect in the Bruno homicide without advising him of his Miranda warnings. Therefore, the confession that followed must be suppressed under *Miranda v. Arizona.*

3. The lengthy videotaped interrogation that followed vividly demonstrates that Dority's confession was not the product of his own free will and intellect, but rather was induced by countless lies, promises and threats, amounting to psychological coercion sufficient to overcome Dority's free will and to delude him as to his true position. 14 Fla.Jur.2nd, page 234; *Haley v. Ohio,* 68 S.Ct. 302 (1948); *Gallegos v. Colorado,* 82 S.Ct. 1209 (1962); and *K.H. v. State,* 418 So.2d 1080 (4 DCa 1982). Dority was easily susceptible to the brainwashing technique employed by superior forces. Compare *Ross v. State,* 386 So.2d 1191 (Fla. 1980), a closely analogous case. Jenkins also repeatedly raised the spectre of the death penalty. *Brewer v. State.*

This court has given due consideration to the two main cases on which the state has relied in opposing the defendants' motions, but finds both to be distinguishable. In *Burch v. State,* 343 So.2d 831 (Fla. 1977), that defendant was a mature adult. His confession was corroborated by physical evidence, adding to its trustworthiness. More importantly, there were no threats or promises made to Burch. Also, since *Burch* was decided before *Brewer,* it may no longer be the panacea some police officers believe it to be. The state's reliance on *Barnason v. State,* 371 So.2d 680 (3 DCA 1979) is misplaced as well. In that case, the defendant was a mature adult, and while psychologically effective "agitation and stroking" techniques of interrogation were employed, no threats or promises were made to Barnason.

In conclusion, it is inexplicable why no prosecutor ever viewed the almost 20 hours of videotaped confessions before the Bruno homicide was taken to the grand jury and the information was filed in the Inman homicide. Of course, the grand jury never saw Gibson's videotapes

30

either. In fact, the first time any prosecutor ever saw or heard the videotapes and cassette tapes in either case was when they were played during the protracted evidentiary hearings. Yet, the state came to the hearings prepared to oppose the motions in "good faith." Since there is a legal presumption that a confession is involuntary, the state should not put such blind trust in confessions it has not seen or heard.

In the event the state takes an appeal from this order, I would respectfully urge the appellate court to view the videotapes in evidence in order to observe the body contact and to discern the hostile, argumentative interrogation not reflected in the cold transcript.