348 So.2d 333 (1977)
STATE of Florida, Appellant,
v.
Ernest Lee DIXON and Herbert Godbolt, Appellees.
No. 75-1384.
District Court of Appeal of Florida, Second District.
May 4, 1977.
Rehearing Denied June 10, 1977.
Robert L. Shevin, Atty. Gen., Tallahassee, and C. Marie King, Asst. Atty. Gen., Tampa, for appellant.
Jack O. Johnson, Public Defender, and Steven H. Denman, Asst. Public Defender, Bartow, for appellee Dixon.
E. David Tyner, of Sumner, Tyner & McKnight, Dade City, for appellee Godbolt.
PER CURIAM.
The state has appealed two interlocutory orders granting appellees' motions to suppress their confessions and to suppress certain other evidence they contend was seized as a result of the "tainted" confessions.
Appellees, Dixon and Godbolt, along with a codefendant Leroy Williams, were suspects in the murder of Gerald "Pops" Brown, for which they were subsequently indicted. They were being held on charges of possession of marijuana which was discovered in the van (owned by the homicide victim) in which the three suspects were found riding shortly after the alleged murder. The arresting officers had probable cause to believe the suspects were involved in the murder and no issue is made herein regarding the stopping or searching of the van.
The suspects were given their Miranda warnings upon arrest, had their initial judicial hearing on the marijuana charges and were appointed the public defender on those charges. The record is silent as to *334 whether any bail was set on those charges but in any case, if it was, they were unable to post it and were detained in the Pasco County Jail for six days. On each of those days the police sought to interrogate them regarding the homicide. On each such occasion the officers repeated the Miranda warnings and on each occasion, at least as to appellees Dixon and Godbolt, they refused to talk about the homicide without the presence of an attorney. On none of these occasions did the attempted interrogation last more than five to twenty minutes.
On the sixth day deputy sheriff John Willie Stewart, who was not previously officially involved in the homicide investigation but who was aware of it and who was a personal acquaintance of appellee Godbolt (nicknamed "Gator"), sought and received permission from the detective in charge of the investigation to get Gator's brother Warren and, in the latter's presence, see if he could get any information from Gator. Deputy Stewart was Warren's landlord, and he liked and respected Warren and felt that between the two of them they could elicit information from Gator.
The two of them were closeted with Gator in an interrogation room in the jail for approximately three or four hours. Before any interrogation began deputy Stewart read to Gator the Miranda warnings from a card. Deputy Stewart said he did not threaten Gator, did not promise him anything, nor did he hold out any hope of reward. Admittedly, when Gator inquired about possibly getting out on bond, deputy Stewart told him he had nothing to worry about if he wasn't involved in any homicide, and that if he had nothing to do with it he could probably have bond set by a judge.
Gator talked on and on about the activities of all the suspects on the night of the alleged homicide which took them from Gainesville to St. Petersburg to the Zephyrhills-Richland area of Pasco County where the homicide allegedly occurred. Gator refused, however, to acknowledge that he knew anything about a homicide or that any of them had assaulted an alleged victim. Deputy Stewart advised him that other detectives were convinced a homicide had been committed but that he, personally, was only concerned with the location of the body; that he only wanted the victim to have a decent burial. While initially Gator avoided any mention of the homicide or location of the body, although he talked freely of the activities of the three suspects on the day in question  in the words of deputy Stewart, "... he never did stop talking to me ...,"  Gator eventually and little by little began giving details of the involvement of all three suspects in the killing of "Pops" Brown, who at least one of them knew and who they picked up in St. Petersburg. Ultimately, he revealed all the details except for the location of the body.
It appears further, that during the course of the conversation with deputy Stewart and his brother Warren, Gator got the impression that his codefendant Leroy Williams, who he later identified as the actual perpetrator of the murder, was trying to pin the homicide on either him or appellee Dixon. Deputy Stewart testified that he made no mention to Gator that Williams was trying to pin it on Gator or Dixon, but that Gator may well have gotten that impression from the fact that all parties to the conversation were well aware that other officers were interrogating Williams separately. Additionally, Gator was aware that friends or relatives of Williams were at the jail that day from which fact, deputy Stewart assumed, Gator concluded that Williams had "copped out", implicating him and Dixon, and was apparently about to be bonded out through the efforts of his friends and relatives.
Concerning appellee Dixon's confession, when, at the conclusion of the conversation with deputy Stewart and Warren Godbolt, Gator refused to give the location of "Pops" Brown's body, deputy Stewart asked Gator if he would reveal the location of the body if Dixon was brought down and if Dixon would agree to it. Gator didn't say whether he would or wouldn't but he did say to deputy Stewart, "Bring Dixon down, go get Dixon." Dixon was brought to the interrogation *335 room where his Miranda rights were read to him. Before the deputy asked Dixon any questions about the crime he related to him all the details of the homicide which Gator had given him, after which Dixon began talking freely. Finally, with Gator and Dixon each suggesting that the other of them tell where the body was (each protesting that he had been confused on the night of the homicide and unfamiliar with the area in Polk County where they had taken and left the body), enough details were revealed that deputy Stewart was able to pinpoint the approximate location of the body.
At that point, both Gator and Dixon agreed to go with the officers to locate the body. Deputy Stewart drove the two suspects and they were accompanied by other officers. The body was in fact located and several items of evidence were found in and about the body and seized. It is these items which are the subject of the second interlocutory order appealed from which suppressed them as having been "tainted" by the confessions, suppressed by the first order.
Following discovery of the body, all parties returned to the Pasco County Jail where, again after having been given their Miranda rights, the suppressed confessions were given separately by each appellee to a court reporter in the presence of three police officers and an assistant state attorney.
The court granted the motions to suppress on the ground that "the state has indeed failed to  to carry its burden to demonstrate that these statements made by Dixon and Godbolt were voluntarily made, and this finding is based on the totality of the testimony... ."
The burden of proving that a confession has been freely and voluntarily given rests upon the state. Reddish v. State, 167 So.2d 858 (Fla. 1964). On the issue of voluntariness, the court must take into consideration the "totality of circumstances" surrounding the confession. Williams v. State, 188 So.2d 320 (Fla.2d DCA 1966). The trial judge's determination of the admissibility of a confession is given great weight. See Ebert v. State, 140 So.2d 63 (Fla.2d DCA 1962).
In Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court outlined certain requirements which must be followed before a confession obtained as a result of custodial police interrogation could be considered to be voluntary. The court held that a defendant's confession could not be introduced into evidence until it is shown that he was first warned of his constitutional right to remain silent and intelligently decided to waive that right. With respect to waiving the right to remain silent, the majority opinion in Miranda stated:
"Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked... ." 384 U.S. 473-474, 86 S.Ct. 1628.
More recently, the U.S. Supreme Court in Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), interpreted Miranda in the following manner:
"A reasonable and faithful interpretation of the Miranda opinion must rest on the intention of the Court in that case to adopt `fully effective means .. . to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored... .' 384 U.S., at 479 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 Ohio Misc. 9, 36 Ohio Ops.2d 237, 10 A.L.R.3d 974.] The critical safeguard identified in the passage at issue is a person's `right to cut off questioning.' Id., [384 U.S.] at 474, [86 S.Ct. *336 1602, 16 L.Ed.2d 694, 10 Ohio Misc. 9, 36 Ohio Ops.2d 237, 10 A.L.R.3d 974.] Through the exercise of his option to terminate questioning he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting. We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his `right to cut off questioning' was `scrupulously honored.'" 423 U.S. 103-104, 96 S.Ct. 326.
In holding that no Miranda violation had occurred in Mosley, the Supreme Court said:
"This is not a case, therefore, where the police failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind. In contrast to such practices, the police here immediately ceased the interrogation, resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation." 423 U.S. 105-106, 96 S.Ct. 327.
Therefore, the question in the instant case can be narrowed to whether there is evidence in the record to support the conclusion that the rights of defendants Godbolt and Dixon "to cut off questioning" were not "scrupulously honored" by the police.
There was nothing wrong in the police having made daily inquiries to see if the appellees wanted to talk. However, deputy Stewart testified that after Godbolt was brought into the interrogation room on the sixth day together with his brother Warren, the following occurred:
"Q. Now, after you read him his Rights, what did you do then?
A. I asked him if he wanted to talk to us about this subject that was supposed to have been killed, the shooting taken place. He said no, he didn't want to talk about it, and so we kept talking and talking. I said: Well, look, we understand  we heard that there was a man killed and that you probably know where he was, and I asked him if he was going to tell us. He jived around and talked and talked and talked. He said: No, I don't want to talk.
So, we kept talking, talking. So, Godbolt talk with him a little bit and he come up with this, continuing talking to him.
Q. How long did you talk to him?
A. I guess we was in there three or four hours, could have been.
* * * * * *
Q. Well, at any point did Gator just say: No, I don't want to talk to you about it?
A. He never did just exactly say he didn't want to talk. He acted like he didn't know too much about it. I say: Gator, we have an understanding there was a man dead, but we just can't find the body, we just want you to tell what happened, and so when he made up his mind to talk, well then, he start.
Q. Well, before he made up his mind, though, he never told you: No, I'm not going to talk; no, I don't want to talk?
A. (pausing) He didn't never  I don't know if he ever say: No, he wasn't going to talk.
Q. Again referring to this deposition, do you recall on page 24, counsel, relating back to 23  on line 18 the question was: Who is: `we,' you and Warren Godbolt and the Defendant Godbolt; Answer: Right, Godbolt's brother, me and both the Godbolt boys. So, we talked and *337 talked. I said: Look, man, we understand there's a man dead, a man did get killed, and I said: That's what the detectives told me, he's dead. I say: At least you could tell me where the man at and let them give him a decent burial, let the family come and bury him, shouldn't leave him out like that. If you throw'd him in the water, let us know, we try to make arrangements to get him home, anywhere else, just tell us; no sense of leaving him like that. He say: No. He said: No, man, I just ain't going to talk, I ain't talking.
Do you recall having give that answer to that question during the deposition?
A. Right.
* * * * * *
Q. Is it true he told you: No, man, I just ain't going to talk, I just ain't talking? Did he tell you that that night?
A. He could have said it. We talked a long time in there."
With reference to the questioning of defendant Dixon who had previously refused to talk about the homicide without the presence of a lawyer, deputy Stewart first testified as follows:
"Q. Now, you testified that you advised Mr. Dixon of his Rights, is that correct?
A. I did.
Q. Did he tell you anything about not wanting to talk to you?
A. No, sir.
Q. What did he tell you?
A. Dixon?
Q. Yes, sir.
A. Dixon didn't say anything right at the time. After I advised Dixon of his Rights, and all, I started talking to Dixon telling him about what Godbolt had told me... ."
However, deputy Stewart later said:
"Q. Referring to page 51 of this deposition, my question: When Dixon came down, isn't it true you asked him about this and he told you he didn't want to talk to you about it; Answer: At first he did.
Now, do you recall what he did, whether he told you that he didn't want to talk to you, or whether he told you he didn't want to talk?
A. When Dixon first came down I read him his Rights. I asked him  after I read him his Rights, and everything, I asked him did he understood. He say: Yeah. Then I started talking to Dixon. I didn't ask Dixon no questions. I told Dixon what Godbolt had told me up to the point that we didn't know where the body was, and I told him we know everything else, that it was a man got killed, what happened in St. Pete, what happened in Gainesville, what happened in Lumberton, and I said: Now, all we're interested in is finding out where the body at. He say he wouldn't tell us where the body was because he wanted to be present. I said: That's the reason I sent for you, and that's when Dixon said: Well, you tell him, and he said: Well, I don't know  that's what Herbert said. They kept rattling off and Dixon said  he had his hand back to his head again like that, he said: All I remember is I saw a sign say: Wildwoods (sic) and we started off from there, and Dixon say a little more and then he'd tell Herbert to say something. He'd say: Tell him the rest, Herbert.
Herbert would mention a little more, and so then I taken it up from there after they got up past Wildwoods (sic) and on the Lakeland Road, I started asking them questions because I knew the route, the road out there."
Thus, it appears that there are some portions of deputy Stewart's testimony from which it could be concluded that both appellees *338 acknowledged that they understood their rights to remain silent and had chosen to waive these rights by beginning to talk. A confession obtained under these circumstances was deemed admissible in Hogan v. State, 330 So.2d 557 (Fla. 2d DCA 1976). On the other hand, there is also evidence that both Godbolt and Dixon indicated an initial desire not to answer any questions in the absence of an attorney but later made incriminating statements only after the interrogation continued.
The totality of the circumstances reflected by the record in this case supports a reasonable finding, which is necessarily implicit in the trial judge's decision to grant the motions to suppress, that the appellees did not unequivocally waive their right to remain silent and their right to counsel as provided in Miranda and Mosley. See Singleton v. State, 344 So.2d 911 (Fla. 3d DCA 1977). Therefore, the orders of suppression must be
AFFIRMED.
GRIMES, J., and WETHERINGTON, GERALD T., Associate Judge, concur.
McNULTY, A.C.J., dissents.