373 So.2d 372 (1979)
William Michael CASON, Appellant,
v.
STATE of Florida, Appellee.
No. 77-1874.
District Court of Appeal of Florida, Second District.
June 29, 1979.
Rehearing Denied July 27, 1979.
John M. Strickland of Strickland & Robie, P.A., Sarasota, for appellant.
*373 Jim Smith, Atty. Gen., Tallahassee and Michael A. Palecki, Asst. Atty. Gen., Tampa, for appellee.
RYDER, Judge.
William Michael Cason, along with a co-defendant, was indicted for first degree murder. Cason filed several pre-trial motions, some of which were granted and others denied. His motion to suppress statements, admissions and confessions was granted in part and denied in part. After trial by jury, Cason was found guilty of first degree murder and sentenced to life imprisonment. This timely appeal followed.
On appeal Cason draws to our attention eight points which he assigns as error.
The record reveals that shortly after the homicide involved herein, and on the evening of April 26, 1977, deputies of the Sarasota County Sheriff's Office picked up appellant for questioning relative to the possibility that Cason was in the possession of goods belonging to the victim of the homicide. Cason led the deputies to a wooded area where he had secreted property belonging to the victim and gave the deputies a false statement in which he stated he had purchased the items from the person who eventually became his co-defendant. Cason was released, but only after he was fingerprinted at the sheriff's office.
Prior to Cason's being questioned about the property, Cason had telephoned the office of Sarasota attorney John Strickland and arranged for an appointment to consult with Mr. Strickland at 7:30 the night of April 26. Cason was unable to keep his appointment due to his involvement with the deputies in regard to the aforementioned property. At 8:30 a.m. on April 27, Cason again called Mr. Strickland and made another appointment to confer with him at 10:30 a.m. Subsequent to Cason's second telephone call and before 10:30 a.m., Mr. Strickland attended two hearings in the Sarasota courthouse. On his way out of the courthouse to meet with Cason, Strickland encountered Sarasota County Sheriff Detective Strauss. Detective Strauss asked Strickland if he was, in fact, representing Cason. Strickland replied that Cason had made an appointment to see him that morning and that he (Strickland) probably would represent Cason. According to the record, Strauss told Strickland that appellant was a witness in a possible murder case and that he would like to talk to him and asked Strickland's permission to do so. Strickland again advised Strauss that the appointment he had with Cason was at 10:30 that morning and that more than likely he would represent Cason. Strickland also told Strauss he had no objection to Strauss' speaking to Cason so long as he (Strickland) was notified and could be present during those discussions.
Cason did, in fact, keep his appointment with Strickland and Strickland agreed at that time to represent Cason.
At 1:30 p.m. on April 27, Cason was arrested by Detectives Strauss and Hartery in Venice (Cason's job site) for murder in the first degree. Cason was read his Miranda[1] warnings at which time Cason responded by advising the officers he first wanted to speak with his attorney before answering any questions. Cason was placed into the deputies' automobile and the trio drove towards the sheriff's office headquarters in Sarasota. During the trip, Strauss drove. Hartery turned on his tape recorder and again read Cason the Miranda warnings. Cason's response was the same. In fact, according to Detective Hartery, Cason stated at this point, "... my lawyer doesn't want me to make any statement." Hartery also testified that Cason asked for an attorney between five and ten times during the trip from Venice to Sarasota. The detectives told appellant they would let him get in touch with an attorney as soon as he was booked. They also told him they would radio ahead for a lawyer. Both Strauss and Hartery testified that the interrogation continued despite Cason's repeated demands to first speak to his attorney.
*374 The early part of the ride was tape recorded. Even during the recorded interview, Mr. Strickland's name came up. The recorder was then shut off but Detective Hartery candidly testified that he continued conversing with appellant about the case even though appellant stated he wanted to remain silent and have an attorney. Hartery admitted he told Cason that a good lawyer would financially break Cason's family and ruin his father's business. Hartery also admitted telling Cason that when his mother finally realized he was a murderer, it would probably kill her. Hartery testified that his purpose in making those remarks was to encourage Cason to make a statement. During the last five minutes of the ride, there was no conversation.
The trial court properly granted Cason's motion to suppress statements made by Cason during the trip from Venice to Sarasota. However, the evils addressed in the motion to suppress statements filed by Cason's attorney went further. It also attacked any and all statements, admissions and confessions that occurred subsequent to Cason's arrival at the sheriff's office in Sarasota. Appellant urges upon us the consideration that the trial court erred in failing to also suppress these statements. We agree and reverse.
The record reflects that the trio arrived at the sheriff's department at 2:16 p.m. They went in the back door to the detective division and reached Detective Hartery's desk at 2:17 p.m. where they met Detective Sergeant Metcalfe, a polygraph operator, and Detective Sergeant Skeens. Detective Strauss testified on the motion to suppress that at that point he recalls that Hartery, Sergeant Metcalfe and Sergeant Skeens began talking to Cason. Strauss didn't recall the content of the conversation, but Strauss (who was at his own desk) did recall hearing Cason ask for a polygraph to prove that he did not have anything to do with hurting the victim.
Detective Sergeant Skeens also testified during the suppression hearing, and he stated he was standing close to his office when the two deputies brought Cason in through the back of the building. Skeens testified that Detective Hartery approached Skeens and "more or less indicated to me" that Cason wanted to take a polygraph. Skeens denies saying anything to Cason prior to Detective Hartery's statement to him. However, Skeens did state he approached Cason and in a half statement, half question remark said to Cason, "... you lied to us last night, didn't you?" At which point Cason responded, "Yes, but I never laid a hand on that woman and I am willing to take a polygraph to prove it."
Thereafter, arrangements were quickly made to perform the polygraph examination and Cason was taken to the polygraph room at 2:20 p.m. The actual examination began at 2:35 p.m. Two polygraph charts were run, the first concluded at 3:15 p.m. and the second at 3:19 p.m. The polygraph operator, Sergeant Metcalfe, thereafter left the room to review the charts. He returned shortly thereafter and told Cason that the charts were bad, that they showed discrepancies which he wanted to see resolved by getting at the truth. He told Cason that he would have to be "straight" with him. The polygraph operator testified that the purpose of these statements was to obtain a statement from Cason. Cason then broke down and gave Metcalfe an oral statement which was not tape recorded.
At 4:20 p.m., Detective Metcalfe took a taped inculpatory statement from appellant which began with the following colloquy:
"Q Would you state your name, age and address?
A William Michael Cason, age 21, Patio Apartments.
Q Okay, Michael, I am going to advise you of your rights again. You have the right to remain silent. Anything you say can be used against you in a court of law. You have the right to talk to an attorney and have him present with you while you are being questioned. If you want an attorney and cannot afford one, an attorney will be appointed to represent you free of charge before any questioning. You can decide at any *375 time to exercise these rights and not answer any questions or make any statements. Do you understand each of these rights I have explained to you?
A Yes.
Q Having these rights in mind do you wish to talk to me now?
A I don't know, I want to talk to you some more, ask you a few more questions.
Q Okay, go ahead.
A If I say I want to talk to a lawyer first, I don't know what good it's going to do me, cause if I want to talk to a lawyer, that mean I'm going to get charged, right?
Q It's not going to mean any difference, all it means is that we're not going to be able to put what you told me before on this statement that's all it means.
A Am I going to get charged though now, what's going to happen now?
Q I have no ...
A If I don't want to talk to a lawyer first, you know.
Q I have no idea what charges they are going to put on you at this point, Michael, formally.
A I'm scared man.
Q After I turn over this statement to the detectives and they talk to the State Attorney they will make the decision of what charges to formally book you up stairs on.
A I don't want to be booked at all, man.
Q Okay, having these rights in mind do you want to talk to me now?
A Yes."
The statement which followed was found by the trial court to have been made voluntarily. We disagree.
The State has a heavy burden of proving with unmistakable clarity that a statement or confession has been freely and voluntarily given before it is admitted against an accused. McDole v. State, 283 So.2d 553 (Fla. 1973); Reddish v. State, 167 So.2d 858 (Fla. 1964); State v. Dixon, 348 So.2d 333 (Fla.2d DCA 1977).
Since its decision in 1966, the case of Miranda v. Arizona, supra, has become a part of the warp and woof, the texture of the fabric of our criminal law regarding the right to remain silent. On the issue of voluntariness, a trial court must also take into consideration the "totality of circumstances" surrounding the confession. State v. Dixon, supra; Williams v. State, 188 So.2d 320 (Fla.2d DCA 1966). In order for a confession to be admissible, it must be freely and voluntarily given and not be influenced either directly or indirectly by any threat, promise, fear, hope, coercion, extortion, or other illegal inducements. Williams v. State, supra.
We believe the totality of the circumstances of this case would dictate that any confession made under these conditions which carried on into the polygraph examination and thereafter, was not the product of a free will and rational intellect.
During the trip back from Venice, Cason clearly manifested his intention not to make a statement. The continuing efforts of the deputies at the sheriff's office to get him to talk can hardly be said to be a scrupulous honoring of his right to cut off questioning. Michigan v. Mosely, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). The record reflects that his confession was induced by a set of calculated illegal circumstances designed for the sole purpose of overcoming Cason's will to resist so that he would confess and, therefore, the order denying the motion to suppress was error requiring this court to order the setting aside of the judgment of guilt and sentence and order a new trial of this case. We have considered all other points raised by appellant and find they are without merit.
REVERSED and REMANDED for new trial.
GRIMES, C.J., and DANAHY, J., concur.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).