# STATE OF FLORIDA v MURRAY

Case No. 90-4737 CF 10A

Seventeenth Judicial Circuit, Broward County

August 27, 1991

## APPEARANCES OF COUNSEL

**Mary Ann Bell,** Assistant State Attorney, for plaintiff.
**Susan Porter,** Public Defender, for defendant.

## OPINION OF THE COURT

J. LEONARD FLEET, Circuit Judge.

### *ORDER ON DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS OBTAINED PURSUANT TO ILLEGAL SEARCH AND SEIZURE*

Defendant, WILLIE FRANK MURRAY, is charged with Trafficking in Cocaine. The evidence against him was obtained pursuant to a warrantless, "consensual" search of his luggage at the Hollywood

Amtrack [sic] Station. The State also alleges Mr. Murray made an incriminating statement at the Hollywood Police Station after his arrest. The State further alleges the statement was not preserved on tape at Mr. Murray's insistence.

At issue on this Motion to Suppress is the voluntariness of the alleged consent to the luggage search and the legality of the alleged incriminating statement.

In three separate hearings, the Court received testimony from the investigating officers of the Hollywood Police Department, the accused and a representative of Amtrack.[1] The scene of the events at the Hollywood Amtrack station has been preserved on videotape, which videotape was made under the supervision, and request of, the Court. Counsel for the State and the Accused were present at the time of the videotaping. The videotape has been filed with the Clerk of Court as a Court exhibit.

## THE SCENE

This event began at approximately 6:00 P.M. on February 27, 1990, at the Hollywood Amtrack station. It was after sunset but before the blackness of nighttime had set in, a time of day referred to as "early dark".[2] The Amtrack station is a rather drab place, bounded on the East by I-95 (which then was undergoing extensive renovation), on the South by Hollywood Boulevard (a main East-West automobile thoroughfare), on the West by a moderately heavily wooded area (which serves as a buffer between the station and adjoining residences) and on the North by Johnson Street. The loading platform of the station extends from Hollywood Boulevard to Johnson Street, a distance of about ¼ mile. The building housing the Amtrack ticket offices and cargo areas is bordered on the South, West and North by paved parking areas utilized by passengers for Amtrack as well as the commuter Tri-Rail. The Tri-Rail ticket booth is located on the Northeast corner of the Amtrack building. The portion of the loading platform which extends beyond the North parking area is bounded on the West by extensively overgrown scrubbrush.

All of the detectives involved in this case[3] were dressed in plain

---

[1] The transcripts of testimony of the separate hearings will be identified as follows:
T-1: April 19, 1991
T-2: April 22, 1991
T-3: June 21, 1991

[2] T-2, pp. 27-28

[3] Detectives Friedman, Murray and Roberts (all of whom had contact with Defen-

clothes, T-shirts hanging out of their pants, not clean shaven and all were wearing dirty sneakers. When Defendant and his party arrived, the detectives were clustered around a bench located on the Southwest portion of the passenger area, a few feet from the entrance to the Amtrack ticket office. All the detectives are Caucasian; all members of Mr. Murray's party are Americans of African descent.

## TESTIMONY OF THE DETECTIVES

The detectives were at the Amtrack station for the sole purpose of interdicting the flow of narcotics on train coming through Hollywood. None of the detectives knew Mr. Murray nor did they have any information suggesting he, or any member of his party, would be, or had been engaging the commission of any criminal activity. The sole reason for Mr. Murray's party to have caught the attention of the interdiction squad was the existence of one or more elements of a "smuggler's profile" devised by Hollywood police.[4]

All of the detectives were certain Mr. Murray's party arrived by automobile at the train station no earlier than 5:50 P.M.[5] nor any later than 6:00 P.M., preceding the actual arrival of the train by some eight or ten minutes. Carry-on luggage was removed from the vehicle by Mr. Murray after which he and his companions walked around the South side of the ticket building and then North on the loading platform (located on the East side of the ticket/cargo building). Because they all had their passenger tickets, none of Mr. Murray's party entered the ticket office.[6]

The detectives noted Mr. Murray made eye contact with them when

dant or his companions) and Detective Simcox (stationed adjacent to the Amtrack ticket office, the entrance of which is located on the South side of the ticket/cargo building)

[4] T-2, pp. 28-30. This particular "smuggler's profile" was described in the following manner: ". . . people travelling to certain destinations, . . . arriving at the last minute when the train is just pulling in, people in possession of tickets, people paying cash for tickets, people arriving in taxicabs from Dade County again in possession of prepaid tickets, people sitting in their cars in the passenger compartment of the vehicle awaiting (sic) for the train's arrival in possession of carry-on bag, people acting very nervous, people arriving at the station hours before the train's arrival . . . possibly from out of town, people only in town for approximately two days or a day, . . . people with call back numbers that are wrong numbers or belongs to somebody else (when compared to the train manifest)."

[5] The Hollywood dispatcher assigned a time of 5:50 P.M. as when the detectives requested a case number, which request was not made until after the cocaine had been discovered in Mr. Murray's luggage. T-2, pp. 42-43

[6] However, the Amtrack representative testified, and the tickets confiscated from Mr.

**181**

he alighted from the automobile. He constantly looked around, seeming to be quite interested in the actions of the detectives. This "looking around" by Mr. Murray continued throughout the time he was in or around the passenger loading area and the parking areas bordering the Amtrack building.

About ten seconds after Mr. Murray's party began to walk North on the loading platform, the detectives walked to a point on the loading platform from which unobstructed surveillance could be conducted. When Defendant's party reached a point on the East loading platform about twenty yards North of the South wall of the ticket/cargo building, Detectives Murray and Friedman began to walk after them. Ultimately Defendant, his wife and their friends reached a point just North of the Amtrack building where they intended to await the arrival of their train.[7] Defendant was observed to continue to look around the parking lot and back towards the detectives who were following them.

After observing them for three or four minutes, Detectives Friedman and Murray approached Defendant and his wife; Detective Roberts made contact with the second couple and Detective Simcox remained in the general vicinity of the entrance to the ticket office. The detectives are quite certain the time was now approximately 6:00 P.M. and the train was running late.[8] Detective Friedman introduced himself and Detective Murray, displayed police identification and requested permission to speak with Mr. Murray. Receiving acquiescence to engage in conversation, Detective Murray asked to, and received permission to, examine all tickets. Found to be in order, the tickets were returned to Defendant and his party. The tickets were noted to have been purchased on February 27, 1990, had been paid for in cash, and were promptly returned.

The ticket examination and return having consumed no more than a minute of time, Detective Friedman then explained the reason for the contact and requested allowance to search the carry-on baggage. No explanation of the right to refuse search permission was made by any

Murray's party show, all tickets were issued at the Hollywood station at 5:52 P.M. on February 27, 1990. T-3, pp. 8-13

[7] There were about ten or fifteen other people waiting in this same area.

[8] The official records of Amtrack, which stand unimpeached, record the time of the train's arrival at the Hollywood station as being 6:01 P.M. and departure as being 6:04 P.M.

182

of the law enforcement officers.[9] After brief reflection, according to the detectives, Mr. Murray agreed to the search request.

As soon as Detective Murray began to search one of the carry-on bags, Defendant blurted out the statement the contents were his and his wife had no knowledge thereof. A small brown paper bag was removed, inside of which was found a clear plastic bag containing suspect cocaine. Mr. Murray was immediately arrested, the suspect cocaine and the carry-on were confiscated for evidentiary purposes and contact was made with the Hollywood dispatcher for a case number and for transportation.

Simultaneous to the confrontation between Detectives Friedman and Murray with Defendant and his wife, Detective Roberts made contact with the couple accompanying Defendant and his wife. Detective Roberts testified he and the second couple were within five feet of Mr. and Mrs. Murray as the latter were involved with Detectives Friedman and Murray.

Simply because the second couple were associated with Defendant and his wife, Detective Roberts made contact with them. From this couple, Detective Roberts obtained consent to search their luggage, a search which revealed no contraband. The search of the bags of Mr. Murray's companions was completed prior to Mr. Murray giving the claimed consent to search his bags.

Because he was busy with the second couple and the search of their luggage, Detective Roberts has no recollection of what Defendant said to Detectives Friedman and Murray. Indeed, Detective Roberts acknowledged his lack of information upon the issue of consent supposedly given by Mr. Murray.[10]

During questioning at Hollywood Police Headquarters, Mr. Murray was reminded of his constitutional rights, which admonition is required by *Miranda v Arizona*.[11] Insisting his statement not be recorded on tape, Mr. Murray acknowledged (1) he had purchased the suspect cocaine in Dade County about two hours before his arrival at the Hollywood Amtrack station and (2) both he and his wife were facing prosecution in Georgia for trafficking in cocaine.

---

[9] Detective Friedman considers the denial of permission to search as evidence of guilt and, as a matter of psychological policy, does not advise the person from whom permission is sought of the right to refuse consent. T-1, pp. 106-109, 112-113. Detective Roberts acknowledges he is possessed of the same opinion in reference to the denial of permission to search. T-2, pp. 81-82.

[10] T-2, pp. 88-92, 98-99

[11] 384 U.S. 436 (1966)

## TESTIMONY OF DEFENDANT

Defendant arrived at the Hollywood Amtrack Station accompanied by his wife, his uncle, his uncle's girlfriend in a vehicle operated by Defendant's sister. Mr. Murray, his wife and his uncle exited the automobile (which was parked adjacent to the Amtrack ticket office), and entered the building together. Mr. Murray purchased four tickets, all of which were put in his name at the request of the ticket agent. Because the train was due in the station in a very brief amount of time, the Amtrack agent directed Mr. Murray and his party to take their luggage to a designated boarding position.[12]

When in possession of their tickets, Mr. Murray, his wife and his uncle returned to the motor vehicle in which they had arrived, retrieved their luggage and began to walk on the loading platform towards a group of other people deemed to be passengers awaiting the same train. While walking North towards the designated loading area, Mr. Murray twice looked back over his shoulder and noted the train to be in sight as it approached the station. Upon arrival at the loading position, Mr. Murray dropped his luggage and waited for the train to arrive.

At this juncture, Detectives Friedman and Murray displayed their badges, inquired whether he was riding the train and requested permission to examine their tickets. In response to Mr. Murray's request for an explanation, Detective Friedman recited the information pertaining to the problem of drugs being transported on the Amtrack train. Pointing out the immediately pending arrival of his train, which was then in view, Mr. Murray declined Detective Friedman's request for permission to search the luggage. Disregarding the fact the train was then ". . . rolling into the station . . ."[13] and he had already been denied permission to search, Detective Friedman folded his arms and stood between Mr. Murray and the passenger car; other passengers were then boarding the train. Detective Roberts was already in the process of examining the luggage of Mr. Murray's uncle and the girlfriend.

At this point, Mr. Murray became very angry, "threw" his luggage back on the ground and began to call the detectives a litany of vulgar names. Mr. Murray asserts there were several detectives present during his diatribe, all of whom contributed to his belief his path to the

---

[12] Mr. Murray did not recall whether the position number was 11 or 111. No other testimony was offered on this point. T-2, p. 114

[13] T-2, p. 117

184

passenger car was to be impeded. It was during this rather ungentlemanly conduct Mr. Murray blurted out the information the gray luggage was his and his wife had no knowledge of its contents.

Mr. Murray vehemently denies ever giving anyone permission to search his luggage. With equal fervor Mr. Murray claims Detective Murray began to search the luggage as soon as Mr. Murray threw the luggage to the ground. Further, Mr. Murray refused to furnish the police with any information regarding his source of supply for the cocaine nor would he agree to cooperate as a confidential informant.

## TESTIMONY OF AMTRACK REPRESENTATIVE

Kenneth M. Bunetta established:

1. All four tickets issued to Mr. Murray were purchased at the Hollywood Amtrack station.

2. All tickets were issued on February 27, 1990, at 5:52 P.M.

3. Amtrack train number 92, northbound, arrived in the Hollywood station at 6:01 P.M. and departed at 6:04 P.M.

## ANALYSIS, FINDINGS AND CONCLUSIONS OF LAW

Every witness involved in this case, except one, is perceived by the Court as having an interest in the outcome of this hearing. Mr. Murray wants both the cocaine and the incriminating statements suppressed for without them the State has no case. If the State has no evidence to use against him, Mr. Murray does not face the possibility of incarceration for a period of time in excess of fifteen years. The law enforcement officers want the Motion to Suppress denied in all respects for many reasons, the listing of some of which is not intended to be exclusive of others: (1) Mr. Murray is clearly guilty of trafficking in cocaine, a crime of such sufficient magnitude as to warrant his incarceration for an extremely long period of time, (2) at the time of his arrest, he was facing similar charges in Georgia, (3) his conduct reflects an attitude of greed as well as total disregard for the consequences of putting the cocaine into general circulation, (4) they are convinced of the propriety of their actions as well as the moral justification therefor, and, not in the least, (5) they have placed their professional reputations behind their testimony.

The only witness not having a vested interest in the outcome of these

**185**

proceedings is the Amtrack representative, Mr. Bunetta. Ironically, his testimony is of major importance in the resolution of the Motion to Suppress.

When conducting a hearing upon the issue of whether an accused legally consented to a warrantless search of an area protected by the Fourth Amendment of the United States Constitution, a trial judge is almost always placed in a position of resolving conflicting testimony. Hardly ever does an accused acknowledge giving *any* consent, much less consent which is deemed to emanate from the exercise of rational judgment. Likewise, it is a rare—almost unheard of—event when a law enforcement officer testifies a warrantless search, in non-exigent circumstances, was conducted in spite of lack of consent. This observation is not meant to belittle either the accused or the law enforcement officers; rather, it is merely official acknowledgement of the reality of the criminal courtroom, a reality which creates the dichotomy now facing this Court.

The proliferation of cocaine[14] has generated such frustration amongst our society, we seem ever ready to relinquish traditional constitutional values in the belief we can stem the tide. Children, whose mothers consumed "crack" cocaine and other drugs while pregnant, are born with serious mental impairments, physical deformities and emotional dysfunctions. The cost, in terms of real dollars and human resources, is rapidly escalating.[15]

Rather than personally accept responsibility for reducing the demand for cocaine, and, concomitantly, enhancing the welfare of our country, we stand aside for we do not wish to become involved. In the name of maintaining a semblance of order under the law, we permit the judiciary the right to vest law enforcement officers with ever growing permission to penetrate areas of privacy historically protected by the Fourth Amendment. An early example of this "frustration phenomenon" is *Carroll v United States*,[16] commonly known as the "automobile exception". Concocted during the era of prohibition, this permission to invade the privacy of an automobile without a search warrant having been issued by a neutral, detached magistrate, is now encrypted into Florida law as F.S. 933.19. Such abdication of power to the courts flies

---

[14] Statistics prepared by the Florida Department of Law Enforcement, and its predecessor, reveal a total of 1,223 arrests for possession and sale of cocaine in 1977 as compared to 35,805 in 1990! These figures are for Florida only!

[15] *Time*, May 13, 1991

[16] 267 U.S. 132 (1925)

186

straight in the face of the republican form of government guaranteed under our Constitution.[17]

Another dramatic demonstration of abdication of power occurred in Florida in 1982 when the following words were added to Article I, Section 12[18] of our Constitution:

Articles or information obtained in violation of this right shall not be admissible in evidence if such articles or information would be inadmissible under decisions of the United States Supreme Court construing the 4th Amendment to the United States Constitution.

We are now forced to conduct our lives within the framework of permission created by judicial and police perceived necessity. Seizing upon the literal language of the Fourth Amendment,[19] the United States Supreme Court has continued to create "exceptions" to the warrant requirement. The issue before the Court today is a direct result of a judicially created "exception" and the obvious determination of an accused to profit from the drug related misery of others.

As pointed out in footnote 4, *supra,* the Hollywood Narcotics Interdiction team has devised a set of characteristics, here denominated "smuggler's profile", as a guide to determine whether to approach a traveller. Both cursory and careful analysis of the several characteristics discloses the breadth of its coverage. It is almost impossible for the average traveller to not fit several of its elements, thereby, in the minds of the Hollywood police, justifying police contact with an otherwise innocuous individual. The United States Supreme Court, in *Florida v Royer*[20] ruled the conformance, without more, with one or more elements of a drug courier profile does not amount to an articulable suspicion the accused is engaged in the commission of a criminal offense, thereby justifying a detention. However, the majority of the

---

[17] A "republic" is defined to mean: a political order in which the supreme power lies in a body of citizens who are entitled to vote for officers and representatives responsible to them. *The American Heritage Dictionary,* Second College Edition, 1985.

[18] Florida's equivalent of the Fourth Amendment to the United States Constitution which addresses the concept of search and seizure.

[19] The right of the people to be secure in their persons, houses, papers and effects, against *unreasonable* searches and seizures, shall not be violated, and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized (emphasis added).

[20] 103 S.Ct. 1319 (1983) affirming *Royer v State,* 389 So. 2d 1007 (Fla. 3 DCA 1981).

Court in *Royer* made clear not every contact between a citizen and a police officer constitutes a seizure.

By virtue of a series of judicial determinations, the law has come to recognize several levels of interaction between police and members of the public, viz.:

1. consensual encounter: minimal contact without a seizure of any type

2. investigative "stop and frisk": when an officer may stop a person if there is well founded suspicion criminal activity is afoot and frisk for concealed weapons if there is justifiable belief the person stopped is armed and dangerous[21]

3. formal arrest, or seizure similar to formal arrest, during which it is necessary for the police to have probable cause to believe a crime has been or is being committed The *Royer* situation is commonly referred to as an "encounter" and engenders no constitutional search and seizure protections; the other two levels of police-civilian contact do trigger Fourth Amendment considerations.[22]

To quote *Simons, supra,* which cites *Lightbourne v State:*[23]

". . . (W)hile there is no litmus-paper test for distinguishing a police encounter from a seizure, a significant identifying characteristic of a police encounter is that the officer cannot hinder or restrict the person's freedom to leave or freedom to refuse to answer inquiries, and the person may not be detained without reasonable objective grounds for doing so."

Further,:

In determining whether a police encounter occurred, the (reviewing) court must look at the facts in light of all surrounding circumstances to determine whether a reasonable person would have believed he or she were free to leave (citations omitted) *State v Simons, supra* at page 787.

---

[21] *Terry v Ohio,* 392 US 1 (1979), codified in Florida as F.S. 901.151.

[22] *State v Simons,* 549 So. 2d 785 (Fla. 2 DCA 1989).

[23] *Simons,* f.n. 22, *supra,* at p. 787; *Lightbourne,* 438 So. 2d 380 (Fla. 1983) cert. den. 465 U.S. 1051 (1984).

188

Applying these principles to the matter now before the Court, the resolution of the issue of consent becomes less difficult.

In the absence of a properly issued search warrant, the burden is always upon the State to establish, by a preponderance of the evidence, legal justification therefor.[24] One of the exceptions to the Fourth Amendment requirement of probable cause as a basis for a warrantless search is one conducted pursuant to consent.[25] The consent must have been given freely and without constraint. The question of voluntariness is one of fact to be determined from the totality of the circumstances.[26] While knowledge of the right to refuse consent is an element to be taken into consideration, the lack thereof is not the litmus test to be applied by the court.[27]

The irrefutable evidence in this case establishes, beyond any reasonable doubt, the tickets were issued to Mr. Murray at 5:52 P.M. on February 27, 1990, by the ticket agent at the Hollywood Amtrack Station. Similarly, the same evidence proves the Amtrack train which Mr. Murray's party planned to ride arrived in the Hollywood station at 6:01 P.M. and departed three minutes later.

The Hollywood detectives all testified their dispatcher was not contacted, for any reason, until *after* Mr. Murray had been formally arrested. The detectives were equally adamant the time of arrest was after 6:00 P.M. According to the evidence, the dispatcher gave 5:50 P.M. as being the time of contact from the detectives. There is no evidence in the record to demonstrate any inaccuracy of the time piece utilized by the Hollywood dispatcher. *If the dispatcher's time check was correct, Mr. Murray was arrested before he purchased his tickets from the Amtrack agent!*

The reliability of the testimony of the detectives is further eroded by hard evidence the tickets possessed by Mr. Murray were all purchased at 5:52 P.M., the Amtrack train actually arrived in Hollywood nine minutes later and Mr. Murray was arrested before the police dispatcher was contacted. This being so, the Court cannot accept at face value the time estimates offered under oath by the detectives, all of whom were

---

[24] *Jeffers v United States,* 72 S.Ct. 93 (1951); *Urso v State,* 124 So. 2d 810 (Fla. 2 DCA 1961)

[25] *Schneckloth v Bustamonte,* 412 U.S. 218 (1973); *Shapiro v State,* 390 So. 2d 344 (Fla. 1980)

[26] See *Norman v State,* 379 So. 2d 643 (Fla. 1980); *Shapiro v State,* f.n. 25, *supra.*

[27] *Schneckloth, supra,* f. n. 25

equally sure Mr. Murray *did not* enter the ticket office at the Hollywood station.

Since the extrinsic evidence renders the testimony of the arresting officers unreliable, the Court has no reason to disbelieve Mr. Murray's claim he refused permission to search and he pointed out the impending arrival of the northbound Amtrack train. Except for his obvious vested interest in having this Court find he did not lawfully give permission to search his luggage nor did he voluntarily make an incriminating statement, there is no reason for the Court to disbelieve Mr. Murray's version of this incident. On balance, Mr. Murray's testimony, is more credible than the testimony given by the arresting officers, not because of the content thereof, but because extrinsic evidence dilutes the testimony of the latter and enhances the testimony of the former.

It is difficult for the Court to accept the proposition Mr. Murray, knowing his luggage contained a large quantity of cocaine and knowing he was facing the same charges in Georgia, voluntarily consented to the search here sought to be justified. The State, apparently, suggested Mr. Murray gave consent to the search, and made the incriminating statement, because he wanted to be chivalrous and protect his wife. There being no disinterested witnesses to either support or contradict the State's contention, the Court must look to extrinsic evidence as an aid to determine the reliability of the testimony. As mentioned above, the extrinsic evidence[28] militates against the reliability of the law enforcement officers as historians in this particular case.

For the reasons here discussed, the cocaine retrieved from Mr. Murray's luggage must be suppressed from use as evidence in the prosecution of this case.

## THE CONFESSION

When an in-custody incriminating statement is offered by the State, the burden of proof to establish voluntariness is much greater than the burden of establishing consent to search. The latter need be shown only by a preponderance of the evidence[29] while the latter is deemed to be quite heavy.[30] When the statement under attack is determined to have been made after a violation of the Fourth Amendment, the mere giving

---

[28] E.g., the dispatcher's time report, the Amtrack records in reference to the issuance of the tickets and the actual schedule of the train, etc.

[29] Footnote 24, *supra*.

[30] *State v Dixon*, 348 So. 2d 333 (Fla. 2 DCA 1977)

of the so-called "Miranda" warnings is not, without more, sufficient to render the statement voluntary.[31] Indeed, the very fact of an illegal detention is a major circumstance to be taken into consideration upon the issue of voluntariness of the alleged confession.[32] When confronted with evidence obtained pursuant to an illegal search, the confession is deemed to be "fruit of the poisonous tree" and must be suppressed.[33]

Because the extrinsic evidence, as pointed out above, renders the testimony of the police less reliable than the testimony of Mr. Murray, the Court must suppress the confession. This conclusion is further bolstered by the case law set forth in this section of this opinion.

## CONCLUSION

The function of a trial judge, when sitting as a trier of the facts, is to evaluate and weigh testimony and evidence based upon the judge's observation of bearing, demeanor and credibility of the witnesses called upon to testify.[34] In reaching the results here announced, the Court has, in addition to the analysis given above, included its observations of all witnesses at the time each witness gave testimony. Paralinguistic cues, accompanied by voice inflection and modulation, give flesh and muscle to the spoken words which appear so coldly in the written record. Utilization of *all* such information is the true function of the Confrontation Clause of the Sixth Amendment of the United States Constitution and Article I, Section 16(a) of the Florida Constitution. There is no effective substitution for observation of witnesses by the fact finder while such witnesses are actually testifying if *Constitutional* justice is to be achieved, even if such achievement occasionally results in an obviously guilty person escaping criminal prosecution for a specified crime.

The foregoing considered, it is thereupon

ORDERED and ADJUDGED Defendant's Motion to Suppress is hereby GRANTED in all respects.

Done and Ordered in Chambers at Ft. Lauderdale, Broward County, Florida, this 27th day of August, 1991.

---

[31] *Brown v Illinois*, 45 L.Ed. 2d 416 (1975); *Dunaway v New York*, 60 L.Ed. 2d 824 (1979)

[32] *Outter v State*, 197 So. 2d 594 (Fla. 2 DCA 1967); *Mallory v U.S.* 354 U.S. 449 (19—)

[33] *Smith v State*, 465 So. 2d 603 (Fla. 3 DCA 1985)

[34] *Shaw v Shaw*, 334 So. 2d 13 (Fla. 1976); *Raheb v Di Battisto*, 483 So. 2d 475 (Fla. 3 DCA 1986)